IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| **JODY LOMBARDO and BRYAN GILBERT,** <br><br> Plaintiffs, <br><br> v. <br><br> **SAINT LOUIS CITY, et al.** <br><br> Defendants. | Cause No.:  4:16-cv-01637-NCC <br><br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Ten officers held Mr. Gilbert prone on the ground for fifteen minutes *after* he was handcuffed and leg shackled inside a secure holding cell. They pushed Mr. Gilbert down by his back, torso, shoulders and biceps, and "lean[ed] over the top" of him until "he stopped breathing." He posed no threat to anyone. Indeed, after being cuffed and shackled, he could not even stand up, let alone attempt to escape or hurt himself within the confines of a jail cell. Thus, there was no legitimate law enforcement purpose served by holding Mr. Gilbert to the ground. Yet the officers held him to the ground for fifteen minutes as he struggled to raise his chest to breathe. The force the officers applied was so substantial that ten officers had to take turns restraining Mr. Gilbert because they were tiring from the physical exertion required to hold his chest to the ground. Those fifteen agonizing minutes were filled with Mr. Gilbert's pleas for help, including, "It hurts. Stop." But the officers ignored his cries. The physical evidence shows Mr. Gilbert died from asphyxiation. In other words—no matter what they claim in carefully crafted affidavits—it's clear that the officers physically compressed Mr. Gilbert's chest into the ground until his breathing muscles gave out and his body was starved of oxygen.

1

What's worse, there's no excuse for the officers' conduct. The dangers of prone restraint—especially for persons experiencing a mental health crisis—have been well-known for decades. This exact conduct—holding a person in the prone position until he asphyxiates—has been repeatedly denounced by the courts, government entities like the U.S. Department of Justice, and even the National Law Enforcement Training Center. Indeed, in 1995, the U.S. Department of Justice issued a "Positional Asphyxia" bulletin instructing law enforcement agencies that:

> ■ As soon as the subject is handcuffed, *get him off his stomach*. Turn him on his side or place him in a seated position.

[SF ¶ 93]. And if the Department of Justice wasn't clear enough, the Courts have weighed in unequivocally: "Creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004). Thus, the officers' behavior is per se, clearly established excessive force. And each defendant officer participated in this unconstitutional conduct. Thus, the Court should deny the individual officers' motion for summary judgment on Counts V, VII, IX, XI, XII, XIII, XV, XVI, XVII and XVIII (excessive force claims).

It wasn't a coincidence that the officers ignored decades of guidance about the dangers of prone restraint. They acted this way because the City's policies and training allowed them to keep a detainee in the prone position indefinitely. Put another way, the City's policies and training—including the lack of a specific directive to get handcuffed subjects off their stomachs—directly led to Mr. Gilbert's death. Given the wealth of information about the dangers of prone restraint, the City knew that its failures would lead to constitutional deprivations. Thus, the Court should

deny the City's motion for summary judgment on counts Count I, II, and III (unconstitutional policies, procedures, and training leading to excessive force).

Finally, Plaintiffs are not pursuing claims for deliberate indifference to medical needs. Nor are they pursuing common law negligence claims. Thus, Plaintiffs consent to dismissal of Counts IV, VI, VIII, X, XIV, XIX, XX.

## STATEMENT OF MATERIAL FACTS

Plaintiffs incorporate by reference their Statement of Additional Material Facts ("SF"). Further, to the extent they are undisputed by Plaintiffs, Plaintiffs also incorporate Defendants' Statement of Facts ("DSF").

## SUMMARY JUDGMENT STANDARD

A court shall grant a motion for summary judgment only if the moving party shows "there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). By definition, material facts include anything that "might affect the outcome of the suit under the governing law," and a genuine dispute of material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In other words, there must be ***nothing*** left for the jury to decide with respect to the matters presented in the motion for summary judgment." *Hartford Acc. & Indem. Co. v. Stauffer Chem. Co.,* 741 F.2d 1142, 1144 (8th Cir. 1984) (emphasis added). "Summary judgment is precluded when there are specific facts showing that there is a genuine issue for trial." *A.J. ex rel. Dixon v. Tanksley*, 822 F.3d 437, 441 (8th Cir. 2016) (quotations omitted).

"Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established its right to judgment with such clarity as

not to give rise to controversy." *Williams v. Ford Motor Co.*, 2013 WL 3874751, at *2 (E.D. Mo. July 25, 2013), citing *New England Mut. Life Ins. Co. v. Null*, 554 F.2d 896, 901 (8th Cir. 1977); *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990) ("We recognize that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries."). "Summary judgment is justified only when, viewing the facts and inferences that may be derived therefrom in the light most favorable to the nonmoving party, the court is convinced that there is no evidence to sustain a recovery under any circumstances." *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983), *abrogated on other grounds by Wyatt v. Cole*, 504 U.S. 158 (1992).

## ARGUMENT

I. **THE INDIVIDUAL OFFICERS USED EXCESSIVE FORCE WHEN THEY CONTINUED TO APPLY PRESSURE TO MR. GILBERT AFTER HE WAS HANDCUFFED AND SHACKLED UNTIL HE STOPPED BREATHING, AND MR. GILBERT'S RIGHT TO BE FREE FROM SUCH EXCESSIVE FORCE WAS CLEARLY ESTABLISHED AT THE TIME OF THE DEPRIVATION**

"The right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." *Ngo v. Storlie*, 495 F.3d 597, 604 (8th Cir. 2007). Whether force is excessive depends on "whether the amount of force used was objectively reasonable under the particular circumstances." *Id.* at 601. To determine reasonableness, courts look to several factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* In the Eighth Circuit, officers' actions may amount to an objectively unreasonable application of force "either singly ***or in combination…***" *Ryan v. Armstrong*, 850 F.3d 419, 428 (8th Cir. 2017) (emphasis added). The use of force is "least justified" when used on "a non-resisting, non-fleeing individual suspected of

a completed, non-violent misdemeanor." *Tatum v. Robinson*, 858 F.3d 544, 549 (8th Cir. 2017). "The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004). In other words, "where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001); *see also Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995) (whether suspect is emotionally disturbed is ***material*** to reasonableness). In *Deorle*, for instance, officers encountered a man who "upset at being diagnosed with Hepatitis C and having consumed a half-pint of vodka and some Interferon, his prescribed medication, began behaving erratically." *Deorle*, 272 F.3d at 1275-76. He "had become suicidal," "lost control of himself" and "began screaming and banging on the walls of [his] house." *Id.* An officer eventually shot the man with a "beanbag round." *Id.* In weighing the reasonableness of the officers' conduct, the court eloquently explained the importance of diminished capacity:

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.

5

*Id.* at 1282-83. Put succinctly, emotionally disturbed persons must be treated differently. *See e.g.*, *Ludwig,* 54 F.3d at 472 ("[S]tandard police procedure regarding emotionally disturbed persons differs greatly from that regarding emotionally stable persons.").

Consequently, the reasonableness standard "should frequently remain a question for the jury." *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999); *see also*, *Hawkins v. City of Farmington*, 189 F.3d 695, 702 (8th Cir. 1999). Courts "rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of 'reasonableness' is itself reasonable and widely shared." *Abraham*, 183 F.3d at 290.

**Gilbert was having a mental health crisis.** The officers were aware that Mr. Gilbert was an emotionally disturbed person, and that he needed help. [SF ¶¶ 84-85]. In fact, the very reason they claim to have entered his cell was to stop him from trying to hang himself with his sweatshirt. Yet instead of simply taking the sweatshirt away and closing the cell door, they handcuffed him, shackled his legs, and held him to the ground in a prone, asphyxiating position for 15 minutes. None of this was necessary or reasonable. Further, even if they felt handcuffing was necessary—which it wasn't—they admit they could have simply handcuffed him and closed the cell door. [SF ¶ 24].

Other witness testimony explains why the officers didn't simply remove the sweatshirt and back away: they had a different motive for entering his cell. Indeed, casting doubt on the officer's suicide explanation, Mr. Gilbert did not even have clothing tied to his neck when officers opened his cell door. [SF ¶ 8]. And a fellow detainee testified that Mr. Gilbert was yelling, which "aggravated" officers who entered his cell "to make him be quiet" because he would not "shut up." [SF ¶¶ 5-6, 10].

6

**Gilbert was not a threat or flight risk.** The officers admit Mr. Gilbert posed absolutely no flight risk. [SF ¶¶ 25, 76, 78]. Mr. Gilbert never left his cell, and "just had his hands up" when engaged by officers. [SF ¶¶ 7, 9]. Further, the officers admit he posed no threat to himself or anyone else once he was restrained in the prone position with handcuffs and leg shackles. [SF ¶¶ 22]. That's especially true in light of his small stature, as Mr. Gilbert was only 5 foot 3 inches tall, and weighed just 160 pounds. [SF ¶ 3]. Indeed, Mr. Gilbert was already locked in a jail cell and, if you believe the officers, was suspected of nothing more than trying to hang himself. Further, he was in the holding cell, not because he committed a violent crime, but because he was accused of trespassing, occupying a condemned building, and failing to appear in court for a traffic citation. [SF ¶¶ 1]. Thus, Mr. Gilbert is the classic case of an individual against whom the use of force is "least justified: . . . a non-resisting, non-fleeing individual suspected of a completed, non-violent misdemeanor." *Tatum*, 858 F.3d 544, 549.

**Gilbert was struggling to breathe.** Any reasonable officer would know that Mr. Gilbert's attempts to "raise up" his chest after he was restrained in the prone position did not constitute criminal resistance, but air hunger from the officers' compression. [SF ¶ 27]. The autopsy report and the relevant literature make this clear. [SF ¶¶ 107, 62]. The City itself admits that can be the case. [SF ¶ 28]. Further, fellow detainees testified that during the restraint Mr. Gilbert was crying for help and could be heard pleading "It hurts. Stop." [SF ¶¶ 11, 13]. Thus, any reasonable officer would have recognized Mr. Gilbert was in distress and ceased to use force. But, in violation of good policing practices, the officers failed to reassess the situation and instead continued to apply deadly force. [SF ¶¶ 73-78].

**The officers used excessive force.** Gilbert was handcuffed, leg shackled, flat on his stomach in a secure holding facility's jail cell, and by no stretch of the imagination a threat to

7

anyone. But directly contrary to established constitutional guidance, the officers continued to apply pressure to Mr. Gilbert's back, torso, shoulders and biceps, thereby compressing Gilbert's chest. [SF ¶¶ 16, 20, 33]. Mr. Gilbert was "held down" for over 15 minutes, after being cuffed and shackled in the prone position. [SF ¶¶ 31].  Each officer directly participated in this excessive restraint.  Officers Stuckey, Bergmann, and DeGregorio were in the first wave, and each applied force to Mr. Gilbert while he was handcuffed and prone. [¶¶ 37-43]. The next wave of officers—Wactor, Mack, King, Lemons, Opal and Cognasso—did the same. [SF ¶¶ 44-47, 49-55]. Finally, Officer VonNida came in as a third wave and continued applying excessive force. [SF ¶¶ 48].

Of course, Defendants now, after realizing the consequences of their actions, try to minimize the amount of force they applied to Mr. Gilbert. But it's clear that a substantial amount of force must have been applied to Mr. Gilbert to cause asphyxiation. [SF ¶¶ 15, 59, 62]. Plaintiffs' expert states that the physical evidence shows Mr. Gilbert died from asphyxiation. [SF ¶ 59]. And it isn't even disputed that the officers' restraint techniques played a role in Mr. Gilbert's death—even the City medical examiner agreed that the restraint contributed to cause his death. [SF ¶ 61]. Further, the sheer number of officers required to hold him down and the fact that each officer became physically exhausted had to be relieved by reinforcements speaks volumes about how much pressure each applied to Mr. Gilbert. In short, the force applied was objectively unreasonable and, in fact, created asphyxiating conditions. None of the *Graham* factors justified any use of force on Mr. Gilbert, let alone using force after Mr. Gilbert was prone, cuffed, and shackled.

**The right to be free from asphyxiating, prone restraint was clearly established.** Courts may look to case law to determine if the right is clearly established, but "there does not need to be a case directly on point." *Tatum*, 858 F.3d at 547. Courts may also look beyond case law to determine that a right is clearly established. *See Morgan v. Swanson*, 659 F.3d 359, 413 (5th Cir.

8

2011); *Champion*, 380 F.3d 893, 902 (6th Cir. 2004) ("[o]ther sources [beyond case law] can also demonstrate the existence of a clearly established constitutional right...."). Indeed, the United States Supreme Court has looked to Department of Justice reports in making the determination. *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002).

For more than two decades, courts have consistently held that holding down a handcuffed, prone suspect is dangerous and unreasonable. *See*, *e.g*. *Weigel v. Broad*, 544 F.3d 1143, 1152 (10th Cir. 2008) ("[T]he law was clearly established that applying pressure to [the suspect's] upper back, *once he was handcuffed and his legs restrained*, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions . . . . *A reasonable officer would know these actions present a substantial and totally unnecessary risk of death to the person*.") (emphasis added); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061-62 (9th Cir. 2003) (holding that the "law was clearly established" and that "*Any* reasonable officer should have known" that "pressing their weight on [the suspect's] neck and torso . . . despite the fact that his hands were cuffed behind his back and he was offering no resistance" constituted excessive force); *Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013, 1019-20 (S.D. Ohio 1999) (finding information existed in law enforcement community that put officers on notice of dangers of asphyxia); *Simpson v. Hines*, 903 F.2d 400, 403 (5th Cir. 1990) (finding ample evidence of excessive force where plaintiff "could have died of asphyxiation resulting from the pressure exerted when [defendant] sat on his chest").

Courts have repeatedly stated that "it [is] clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Champion*, 380 F.3d at 903. Indeed, "[c]reating asphyxiating conditions by putting substantial or significant pressure, such as

body weight, on the back of an incapacitated and bound suspect constitutes *objectively unreasonable* excessive force." *Id.* (emphasis added). This concept is not novel, nor one expressed only by Courts. It is well known in the law enforcement community. [SF ¶ 87]. Indeed, in 1995, the U.S. Department of Justice specifically warned all law enforcement agencies about the dangers of prone restraint and provided guidelines for preventing these unnecessary deaths. [SF ¶ 88]. Chief among those suggestions was its directive that "[a]s soon as the suspect is handcuffed, get him off his stomach." [SF ¶ 93].

Putting pressure on a handcuffed individual in the prone position, in a jail facility, has recently been found to be excessive force. *Hopper v. Phil Plummer*, 887 F.3d 744, 745 (6th Cir. 2018). In *Hopper*, officers forcibly restrained an inmate in the prone position for twenty-two minutes until he died. *Id.* One officer controlled the inmate during the prone restraint by placing a hand on his "shoulders or upper back." *Id.* at 750. The officers took turns restraining the individual, replacing each other as the incident progressed. *Id.* The evidence revealed that "if an individual's arms and legs are restrained like Richardson's were, that individual cannot use them to alleviate the compressive pressure, will fatigue '[o]ver time,' and his '[r]espiratory movements will ultimately stop.'" *Id.* The Court concluded "we affirm the district court's conclusion that it '[w]as unconstitutional' on May 19, 2012, to create asphyxiating conditions by 'forcibly restraining an individual in a prone position for a prolonged period of time' when that individual posed no material threat." *Id.*

Summary judgment was recently denied in a 2017 case with similar facts as here. There:

The officers believed that given Layton's continued resistance, it was best to keep him on his stomach, and Baker used his hands to press Layton's shoulders to the ground. At the same time, Groby held Layton's thighs to the ground, as Layton was trying to rise to a kneeling position.

10

*Hanson for Layton v. Best*, No. CV 15-4578 (MJD/SER), 2017 WL 5891697, at *2 (D. Minn. Nov. 28, 2017). The Court distinguished *Ryan v. Armstrong*, finding it is a different story when the individual "was restrained by handcuffs and the hobble, [and] he only sporadically resisted the restraints yet he was forced to remain on his stomach." *Id.* at 7. The court held "[v]iewing the facts in the light most favorable to Plaintiff, and recognizing that the defendant officers do not dispute that when a suspect is restrained, it is best to keep him on his side or in a recovery (sitting up) position, a jury could reasonably find that Layton could be safely moved off his stomach while awaiting the ambulance. Accordingly, the Court finds there is a genuine issue of material fact as to whether the officers used excessive force by keeping Layton in a prone position for an extended period of time after he was placed in restraints." *Id.* Citing the case law above, the court further held "If it is determined that it was not objectively reasonable to leave Layton in a prone position after he was maximally restrained, and that defendant officers could have intervened to prevent such use of excessive force, the Court finds that it is clearly established that such conduct would constitute a violation of Layton;s constitutional rights." *Id.* at 8.

Needless to say, it was clearly established that the officers' actions were in violation of Mr. Gilbert's rights. Given the legal precedent and non-decisional authority on point any reasonable officer should have known that the force was unnecessary and extremely dangerous. [SF ¶¶ 86-107]

**Defendants' citations are inapposite.** Defendants' halfhearted attempt to analogize this case to other cases falls apart as soon those cases are read. Defendants claim it is reasonable to use (apparently deadly) force if an individual is "combative, non-compliant, and potentially dangerous

11

to himself or others." [Doc. 67, p. 11]. They cite four cases—with no analysis—to support the claim: *Ryan*, *De Boise*, *Mann* and *Winters*.

**Ryan is not on point.** In *Ryan*, the defendants restrained an individual by holding him down "while *attempting to place his wrists and ankles in restraints*." *Ryan*, 850 F.3d 419, 424, 428 (emphasis added). Thus, the citizen in Ryan was held down *before* he was put into wrist and ankle restraints. Here, Mr. Gilbert was held down *after* he was handcuffed and in leg shackles. [SF ¶ 102]. That makes all the difference. Everyone agrees the prone position is OK *until* the suspect is handcuffed. It's what happens after the cuffs are applied that matters. [SF ¶ 93] ("As soon as the suspect is handcuffed, get him off his stomach.").

What's more, the citizen in *Ryan* was held down for *three* minutes *before* he was cuffed. *Ryan*, 850 F.3d 419, 424, 428. Mr. Gilbert was held down for *fifteen* minutes *after* he was cuffed—five times longer than *Ryan*. [SF ¶ 31]. Finally, Ryan's cause of death was simply "sudden unexpected death during restraint." *Ryan*, 850 F.3d 419, 424. Here, it's undisputed that the officers' forcible restraint contributed to cause Mr. Gilbert's death. [SF ¶ 61]. And Plaintiff's expert explicitly states that the prone restraint asphyxiated Mr. Gilbert. [SF ¶ 59].

Perhaps most telling, Defendants' own expert agrees this case is far different from *Ryan*. [SF ¶ 71]. And Defendants' expert agreed those differences "increased the risk of [Mr. Gilbert's] death." [SF ¶ 60]. So *Ryan* tells us nothing about whether the officers' actions in this case were reasonable. *Ryan* says you can hold someone down for three minutes *before* you get restraints on. It says nothing about holding someone down in the prone position *after* they are restrained and posing no threat to anyone, and until they stop breathing.

**De Boise offers Defendants no support.** *De Boise v. Taser International, Incorporated* involved tasing and sedating a man who was threatening police in a front yard at nighttime. 760

12

F.3d 894-96 (8th Cir. 2014). At no point was the individual restrained in the prone position, nor was he ever in a holding cell. Finally, Defendants' description of the holding that the force was "reasonable" is unsupportable. Indeed, the court skipped the analysis of excessive force, relying entirely on the fact that the individual's constitutional rights were not clearly established. *Id.* at 896-98 ("We, therefore, hold that even if Officers Percich's and Lively's repeated tasings of De Boise amounted to excessive force in violation of De Boise's Fourth Amendment rights, such rights were not clearly established at the time of the incident."). So *De Boise* is entirely inapposite.

*Mann* **and** *Winters* **offer no guidance.** In *Mann v. Yarnell*, officers punched and used a dog to bite an individual that the officers knew was on the run from police after firing at officers and claiming he would go out in a blaze of glory if they tried to arrest him. 497 F.3d 822, 823-25 (8th Cir. 2007). In *Winters v. Adams*, an officer punched a man in the face as he was resisting being removed from his own vehicle. 254 F.3d 758, 765 (8th Cir. 2001). At no point was either individual restrained in the prone position, nor was either ever in a holding cell. So *Mann* and *Winters* give the Court no guidance as to whether it is reasonable to hold down an individual in a holding cell for at least 15 minutes *after* he was handcuffed and leg shackled until he stops breathing. All of the force applied in those cases occurred before the individual was restrained. In other words, Defendants fail to cite a single instance where force was found to be objectively reasonable when applied after an individual was restrained in the prone position in a secure facility.

Taking the facts in the light most favorable to Plaintiffs, there is more than sufficient evidence for a jury to conclude that such deadly force was excessive and objectively unreasonable. Defendants' Motion must be denied.

## II. THE CITY'S UNCONSTITUTIONAL POLICIES AND PROCEDURES, AS WELL AS ITS DELIBERATELY INDIFFERENT TRAINING OF ITS OFFICERS, CAUSED THE VIOLATION OF MR. GILBERT'S CONSTITUTIONAL RIGHTS

(A) Establishing a constitutional violation is, obviously, the first element of Plaintiffs' § 1983 claim against the City. Second, Plaintiffs must provide evidence that *either* (B) the constitutional violation flowed from a City policy *or* (C) the constitutional violation was caused by the City's deliberate indifference in failing to train its employees or enact adequate policies. *Monell v. Dep't of Soc. Serv. of N.Y.*, 436 U.S. 658, 690-95 (1978) (violation flows from policy); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389-92 (1989) (failure to train). Ample evidence supports each of these elements.

### A. The Individual Officers Used Excessive Force When They Continued to Apply Pressure to Mr. Gilbert after he was Handcuffed and Shackled until he Stopped Moving

The individual officers used excessive force, as fully described above in SECTION I. Thus, the first element of Plaintiffs' claims against the City is satisfied.

### B. The City's Policy for Restraining Citizens in Holding Cells is Facially Unconstitutional and Caused the Violation of Mr. Gilbert's Rights

A municipality is responsible under § 1983 when "execution of a government's policy or custom . . . inflicts the injury . . . ." *Monell*, 436 U.S. at 694. Meaning, the policy is the "moving force of the constitutional violation." *Id.* "Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving [the] issues of fault and causation is straightforward." *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389-90 (8th Cir. 2007) "To establish a constitutional violation, no evidence is needed other than a statement of the municipal policy and its exercise." *Id.* at 389-90.

The City admits that its policies and procedures direct officers to hold a citizen down in the prone position, handcuffed and leg shackled, without a time limit. [SF ¶¶ 108-124]. This policy

is facially unconstitutional.[1] Yet The City specifically trains officers to restrain citizens in this manner. [SF ¶¶ 117, 122]. Thus, the City's policy was the moving force behind the officers' unconstitutional restraint of Mr. Gilbert.

Several courts have expressly ruled that the extended prone restraint of a bound citizen is an unconstitutional use of force based upon the high risk of death by asphyxiation. *See infra* SECTION I. Because, as the City admits, all of the officers acted pursuant to the City's policy, and those actions were unconstitutional, the City's Motion should be denied.

### C. The City's Failure to Train its Officers or Enact Constitutional Policies Amounts to Deliberate Indifference to Citizens' Rights

Even absent an unconstitutional policy, the City would still be liable based on its failure to train. *See City of Canton*, 489 U.S. at 388. Liability is established "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* Where the need for more or different training is obvious and the inadequacy is likely to result in the violation of constitutional rights, a municipality is deliberately indifferent to the need for more training. *Id.* at 390.

Notice is given heavy weight in determining deliberate indifference. *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013). But a plaintiff does not have to show "a pattern of constitutional violations." *See Bd. of County Com'rs v. Brown*, 520 U.S. 397, 409 (1997). A constitutional violation "may be a highly predictable consequence" of a municipality's failure to train. *Id.* "The likelihood that the situation will recur and the predictability" that officers who are not adequately trained will violate citizens' rights can justify a finding of deliberate indifference. *Id.* Moreover, a "high degree of predictability" may support an inference that the

---

[1] *See infra* SECTION I.

municipality's deliberate indifference led to the "very consequence that was so predictable." *Id.* at 410-11.

The City does not train its officers on how long they can restrain an individual in the prone position while handcuffed and bound. [SF ¶ 122]. The City does not train its officers on what to do in situations when an individual is in a chemically-induced state struggling against multiple officers after being handcuffed. [SF ¶ 123]. It simply says that's the officer's call. [SF ¶ 123]. The City does not have any training documents instructing officers that putting detainees in the prone position should be done with caution due to the risk of asphyxiation. [SF ¶ 121]. The City admits it should train its officers about positional and compression asphyxiation, but there is nothing in the City's training manual about those topics. [SF ¶¶ 118, 120]. The City's expert admits Officers should receive training about preventing in custody deaths and safely apprehending emotionally disturbed or suicidal persons, but the City does not have any material on training, policies, procedures or rules about what officers are supposed to do when restraining a suicidal inmate within a holding cell. [SF ¶¶ 124, 136]. Nor does the city provide any specific training or guidance for restraining individuals who are already locked in holding cells. And that is despite the fact that the City's expert agrees that officers *will* encounter suicidal persons in holdover facilities, and that there need to be different policies and procedures in a holdover facility than in the field to ensure the safety of detainees. [SF ¶¶ 112, 133-35]. Importantly, the City admits that if officers are not properly trained about compression asphyxia, then someone could get killed. [SF ¶ 119]. Put slightly differently, with zero guidance, constitutional violations are highly predictable, if not certain.

The City certainly had notice about the dangers of asphyxia during prone restraint. Foremost, the body of case law discussing these dangers—and finding that officers who ignored

16

them committed constitutional violations—is well established. *See infra* SECTION I. Just as importantly, the literature on the subject is undeniable, to the point where the State of Ohio has banned prone restraint entirely.

In July 2000, Dr. Fabrice Czarnecki gave a powerpoint presentation at the National Law Enforcement Training Center's Annual Seminar titled "In-Custody Death." [SF ¶ 99]. It lists "In-Custody Death Prevention Guidelines." [SF ¶ 100]. And most important, the guidelines explicitly state, "Do not compress the chest." [SF ¶ 101]

What's more, these dangers have been well known in the law enforcement community for decades prior to Mr. Gilbert's death.  Perhaps most telling, in 1995, the U.S. Department of Justice published a bulletin titled "Positional Asphyxia—Sudden Death.[2]" [SF ¶ 88].  It "identifies factors found to precipitate positional asphyxia, and provides recommendations for ensuring a subject's safety and advisory guidelines for care of subject." [SF ¶ 89]. It also describes the basic physiology of a struggle that leads to asphyxia:

- A suspect is restrained in a face-down position and breathing may become labored;
- weight is applied to the person's back—the more weight, the more severe the degree of compression;
- the individual experiences increased difficulty breathing;
- the natural reaction to oxygen deficiency occurs—the person struggles more violently;
- the officer applies more compression to subdue the individual.

[SF ¶ 90]. And it concludes that "to help minimize the risk of positional asphyxia . . . the use of maximal, prone restraint techniques should be avoided." [SF ¶ 91]. The bulletin also lists guidelines from the New York City Police Department for "preventing deaths in custody." [SF ¶ 92]. The guidelines state that "[a]s soon as the subject is handcuffed, get him off his stomach. Turn

---

[2] This is, of course, a self authenticating document.  FED. R. EVID. 902(5).

17

him on his side or place him in a seated position." [SF ¶ 93]. The City's expert agrees that the officer must put a handcuffed person on the side as soon as they can, because it's dangerous if they don't. [SF ¶ 95]. The City admits that the officers did not get Mr. Gilbert off his stomach as soon as he was handcuffed. [SF ¶ 96]. Finally, the City's expert agrees that as soon as the suspect is handcuffed the officers should get him off his stomach, and that the officers' actions in not getting Mr. Gilbert off his stomach as soon as he was handcuffed was against the U.S. Department of Justice's guidelines. [SF ¶¶ 97].

Other entities heed the warnings. In 2009, the State of Ohio banned the use of prone restraint entirely. [SF ¶ 102]. Due to the ban, Ohio State Highway Patrol Officers are given mandatory training on the use of restraint. [SF ¶ 103]. And the ABA Standards for Criminal Justice, Treatment of Prisoners, published in 2011, states "Correctional authorities should not hog-tie prisoners or restrain them in a fetal or prone position." [SF ¶ 104].

According to the City's expert, officers across the United States should have been trained about the dangers of compression asphyxia from the time the USDOJ bulletin was sent out in June 1995. [SF ¶ 98]. Despite all of the guidance and warnings against it, the City trains its officers that in some circumstances it's okay to continue to hold a person to the ground after handcuffing. [SF ¶ 117].

By failing to train and implement policies concerning these dangers—and even worse, implementing a policy that is well-known to cause death—the City was deliberately indifferent to citizens' rights. The City's deliberate indifference caused the violation of Gilbert's rights, and ultimately, his death.

**III.      CONCLUSION**

Mr. Gilbert was enduring a mental health crisis. Mr. Gilbert was not a flight risk, had committed no violent crime, and once his sweatshirt was taken away, he was not a threat to anyone, including himself. Yet Officers responded by cuffing, shackling, and forcing him prone on the ground for fifteen minutes until his lungs were starved of oxygen. This is a per se, clearly established violation of long-standing constitutional norms. Worse still, the City caused this death by condoning this dangerous conduct through a combination of poor policies and an absence of training. This Motion should be denied so a jury can determine the reasonableness of the Defendants' actions.

        Respectfully submitted,

        **THE SIMON LAW FIRM, P.C.**

By:   */s/ Patrick R. McPhail*
       Kevin M. Carnie Jr., #60979MO
       Patrick R. McPhail, #70242MO
       800 Market Street, Suite 1700
       St. Louis, MO 63101
       Telephone:  314-241-2929
       kcarnie@simonlawpc.com
       pmcphail@simonlawpc.com

       Andrew W. Callahan, #60714MO
       P.O. Box 15159
       St. Louis, Missouri 63110
       Phone: (618) 791-5501
       ac@callahanfirmstl.com

       *Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on August 31, 2018, I electronically filed the foregoing with the clerk of the court using the CM/ECF system which will send notice of electronic filing to all counsel of record.

                                        */s/ Patrick R. McPhail*
                                        Patrick R. McPhail