# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| JODY LOMBARDO and<br>BRYAN GILBERT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:16-CV-01637-NCC |
| v. | ) | |
| | ) | |
| SAINT LOUIS CITY, RONALD BERGMANN, | ) | |
| JOE STUCKEY, PAUL WACTOR, | ) | |
| MICHAEL COGNASSO, KYLE MACK, | ) | |
| ERICH VONNIDA, BRYAN LEMONS, | ) | |
| ZACHARY OPAL, JASON KING, | ) | |
| and RONALD DEGREGORIO, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Motion and Memorandum in Support to Partially Exclude the Expert Testimony of Defendant's Expert Ronald Schwint (Doc. 55), Plaintiffs' Motion and Memorandum in Support to Partially Exclude the Expert Testimony of Officer Philip Green (Doc. 56), and Defendants' Motion to Exclude Expert Testimony (Doc. 64) of Plaintiffs' experts Michael Leonesio and Dr. Francisco Diaz. The Motions are fully briefed and ready for disposition. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. 636(c)(1) (Doc. 12).

For the following reasons, Plaintiffs' Motion and Memorandum in Support to Partially Exclude the Expert Testimony of Defendant's Expert Ronald Schwint (Doc. 55) will be **GRANTED, in part**, **and DENIED, in part.** Plaintiffs' Motion and Memorandum in Support to Partially Exclude the Expert Testimony of Officer Philip Green (Doc. 56) will be **GRANTED, in part, and DENIED, in part.** Defendants' Motion to Exclude Expert Testimony (Doc. 64)

will be **GRANTED, in part, and DENIED, in part.**

## I.     Background

In this 42 U.S.C. § 1983 case, Plaintiffs sued the named Defendant Officers in their individual capacity, claiming that they used unconstitutionally excessive force by restraining Plaintiffs' son, Nick Gilbert, inside of a holdover cell, resulting in his death.  Plaintiffs also sued the St. Louis City ("City") based on its policies, practices, protocols, customs, procedures, and training as related to the force used in this case.  On July 24, 2018, Defendants filed a Motion for Summary Judgment on all claims.  (Doc. 63.)  Both parties filed the instant motions to exclude expert testimony.  The Court has addressed the motions to exclude before ruling on the Motion for Summary Judgment.

A more detailed discussion of the facts, only some of which are repeated here, can be found in this Court's Order addressing Defendants' Motion for Summary Judgment, filed concurrently with this Order.  On December 8, 2015, Nicholas Gilbert ("Mr. Gilbert") was arrested by St. Louis Metropolitan Police Department ("SLMPD") officers on a misdemeanor violation.  (Doc. 86 ¶ 1.)  He was taken to the SLMPD's central patrol station and placed in a holdover cell.  (Doc. 78 ¶ 14.)  After Mr. Gilbert exhibited some erratic behavior and seemingly attempted to hang himself with a sweatshirt inside of the cell, some of the Defendant Officers entered his cell.  (*Id.* ¶¶ 31–33, 36, 40, 42, 44, 45, 47.)  When Mr. Gilbert evaded being handcuffed, a struggle ensued. (*Id.* ¶¶ 53, 54.)  Mr. Gilbert was eventually handcuffed.  (*Id.* ¶¶ 53, 57.)  He continued to struggle, including kicking an Officer in the groin and was eventually placed in leg shackles, after which an initial call to EMS was placed.  (*Id.* ¶¶ 60, 62, 64.)  While in handcuffs and leg shackles, Mr. Gilbert was eventually moved into a prone position.  (*Id.* ¶ 75.)  Additional Officers relieved some of the initially-responding Officers and assisted in

restraining Mr. Gilbert. (*Id.* ¶ 70.) At some point, Mr. Gilbert's breathing became abnormal, and he eventually stopped breathing. Some Officers performed CPR until emergency responders arrived. (*Id.* ¶ 103.) Mr. Gilbert was transported to the hospital, where he was pronounced dead. (*Id.* ¶ 105.) This suit followed.

## A. Plaintiffs' Experts

### 1. Michael Leonesio

Plaintiffs retained Michael Leonesio to provide an opinion on the Defendant Officers' use of force against Mr. Gilbert and on the SLMPD practices and policies related to this matter. (Doc. 74-3.) His report and deposition have been provided to the Court. (Docs. 65-2, 74-3.)

Mr. Leonesio is a California Commission on Peace Officers Standards and Training ("CA P.O.S.T.") police academy instructor; tactical firearms instructor; critical incident response instructor; response to active shooter instructor; and defensive tactics and baton instructor. (Doc. 74-3.) He is a certified as a forensic analyst and an instructor in the identification, prevention, management and investigation of in-custody deaths and excited delirium and agitated chaotic events, and he is a co-developer and instructor of an electronic control device forensic analyst course through the Institute for the Prevention of In-Custody Deaths. (*Id.*) Since 2002, he has developed and provided law enforcement instruction to agencies throughout the United States and Canada. (*Id.*) He has trained officers or developed training in areas including use of force, responding to emotionally disturbed persons, and preventing and investigating in-custody deaths. (*Id.*) He has rendered opinions in many law enforcement use-of-force cases. (*Id.*) He has testified in areas including police practices and procedures, law enforcement best practices, and use of force analysis and investigation. (Doc. 74-1.)

Mr. Leonesio started as a police officer in San Carlos, California, in 2001, where, among other things, he was a use-of-force subject matter expert. (*Id.*) He transitioned to the Oakland, California, police department in 2005, where his duties included department subject-matter expert for in-custody death prevention/investigation. (*Id.*) He was a police officer in that department until 2012. (*Id.*) As a member of these police departments, he researched, wrote, reviewed and implemented department training curriculum, policy, and rules related to the use of force and the use-of-force reporting and investigation. (Doc. 74-3.) He sat as a subject-matter expert on the use of force review boards at both departments. (*Id.*)

In 2005, he also started consulting with the Institute for the Prevention of In-Custody Death, Inc., out of Nevada. (Doc. 74-1.) From 2009 to 2012, he was a staff instructor for that Institute. (*Id.*) In 2008, he started his own consulting firm. (*Id.*) He consults on a variety of topics, including law enforcement training/policy review, analysis, development, and implementation, and he provides litigation consulting and expert services through that consulting firm. (*Id.*) He has consulted with various international, federal, state, and municipal law enforcement agencies and associated organizations on police use of force and police practices. (*Id.*)

Mr. Leonesio is a member of a variety of professional associations, including the National Association of Civilian Oversight and Law Enforcement and has received a variety of professional awards relating to his police work. (*Id.*) He has a lengthy list of published works and professional awards and has completed a variety of continuing professional training programs. (*Id.*) His professional certifications include the Tennessee Commission on Peace Officer Standards and Training and the California Commission on Peace Officer Standards and Training. (*Id.*) He also has an extensive background in the use of electroshock weapons. (*Id.*)

Relevant to Defendants' motion to exclude Mr. Leonesio's testimony, Mr. Leonesio testified about the Defendant Officers' actions and whether the use of force was reasonable in this case. He opined in his report and deposition that the use of force in this case was excessive, unnecessary, and unreasonable, citing to, among other things, the Supreme Court's decision in "*Graham v. Conner* [sic], 490 U.S. 396 (1989)," the Fourth Amendment, and the objectively reasonable officer standard. (Docs. 74-3, 65-2.)

In his report, for example, Mr. Leonesio concluded that the Sergeant Bergmann, Officer Stuckey, and Officer DeGregorio,[1] some of the initially responding officers, failed to reassess the circumstances and de-escalate their force, unnecessarily shackling Mr. Gilbert and continuing to apply force. (Doc. 74-3.) He further opined that while those Officers' actions may have been acceptable in a field setting, they were "excessive, unnecessary, and unreasonable" in the secure holding facility. (*Id.*) He ultimately concluded, in summary, that "the use of force against Mr. Gilbert, post handcuffing, was excessive, unnecessary, and unreasonable." (*Id.*)

Mr. Leonesio offered opinions throughout his deposition about the Officers' actions, repeatedly concluding that their actions were unreasonable. (*See generally* 65-2.) For example, he opined that all actions after Mr. Gilbert was handcuffed were unreasonable. (Doc. 65-2 at 54:17–55:22; *see also id.* at 102:19–103:14.) He testified that he did not think the use of leg shackles was reasonable, particularly to the extent "I think they created the need to do that," and that the use of leg shackles was not reasonable just because Mr. Gilbert would not stop moving. (*Id.* at 61:10–13, 62:2–17, 84:13–17.) He further testified that there was no need to use leg shackles on Mr. Gilbert because it was his opinion that Mr. Gilbert only unintentionally kicked

---

[1] These are the only officers Mr. Leonesio mentions in his report. (*See* Doc. 74-3.) In his deposition, however, he opined that all of the involved Officers' actions were unreasonable. (Doc. 65-2 at 101:14-17.)

an officer.  (*Id.* at 62:18–63:7, 63:17–64:16.)  He also testified that it was "not reasonable" for the officers to control Mr. Gilbert because they thought he might beat his head against the concrete or use leg shackles, testifying that the officers' intent or goal or motive throughout the encounter was "to try and stop him from any kind of movement."  (*Id.* at 57:5–58:8, 62:15–17, 84:13–86:16; *see also id.* at 91:2–92:9.)  Moreover, he testified that it was his opinion that it was not reasonable for the Officers to continue to restrain Mr. Gilbert on the ground instead of letting him flop around on the ground even though there was a risk that Mr. Gilbert could get injured if he had not been restrained.  (*Id.* at 79:21–81:4.)  In addition, he testified it was not "reasonable to kill someone or cause someone's death in order to save them."  (*Id.* at 80:1–4.) He concluded that the Officers' actions did not meet "objective reasonableness" despite the fact that Mr. Gilbert was "flopping around," "kept moving," and was "fighting his restraint."  (*Id.* at 84:13–86:16.)

In examining the Officers' actions, Mr. Leonesio "[took] into account 'the nature and quality of the instruction on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake.'"  (Doc. 74-3.)  He concluded in several instances that the Officers' actions were not in the government's interests.  For example, he testified that Mr. Gilbert's attempt to harm himself was probably not a "governmental interest" that would "rise to a high level of force."  (*Id.* at 52:20–55:22.)  In another instance, he testified that after putting handcuffs on Mr. Gilbert it "took it over the top for me to become excessive.  You're trying to do something unreasonable.  It's not in the government's interest."  (Doc. 65-2 at 55:12–20.)  He also testified that there was no "legitimate law enforcement purpose of stopping all movement" when Mr. Gilbert was "continuing to struggle."  (*Id.* at 67:1–3; *see also id.* at 80:7–11; 104:3–14.)  He concluded that even though Mr. Gilbert was continuing to struggle, the

Officers "c[ouldn]'t just go in there and put him in a straightjacket. You can't just go in there and . . . . do a bunch of things 'cause he's moving. Well, yeah, he kept moving and he was struggling against the restraints. Okay?" (*Id.* at 66:22–67:12.) He further testified that stopping Mr. Gilbert from "fighting the restraints" is "not a legitimate law enforcement purpose." (*Id.* at 80:11–13.)

Relevant to Defendants' motion to exclude Mr. Leonesio also testified that the City's training program is unconstitutional, citing to case law and legal tests regarding municipal liability and concluding that the SLMPD's "lack of training led to the deprivation of Mr. Gilbert's constitutional rights." (Doc. 74-3.) He opined that SLMPD failed to properly train its officers. (Doc. 74-3; Doc. 65-2 at 11:19–115:22.) However, he testified "I don't know what training they had," "I didn't see it," and "I didn't look at their training, I didn't have access to that," "I don't know what their training looks like." (Doc. 65-2 at 111:19–112, 114:2–115:22.) He stated "it seems to be they're all using the same training because they are all pretty much acting very, very similarly." (*Id.* at 113:12–14.) He also testified that he "very limited exposure" to the SLMPD's policies. (*Id.* at 110:19–24.)

2. Dr. Francisco Diaz

Plaintiffs retained Francisco J. Diaz, MD FCAP, as an expert and consultant in forensic pathology and asked him to provide his opinion as to the cause and manner of Mr. Gilbert's death. (Doc. 74-6.) His report and deposition have been provided to the Court. (Docs. 65-4, 74-6.)

Dr. Diaz is a practicing forensic pathologist who has been in practice for nearly twenty years. (Doc. 74-6.) He is a board certified anatomic pathologist and forensic pathologist. (*Id.*)

He has performed 9,000 post-mortem examinations, testified in court approximately 400 times, and been deposed over 100 times. (*Id.*)

Dr. Diaz attended medical school in his native country, the Dominican Republic, where he obtained his medical degree. (*Id.*) He went on to pursue his training in the United States after being certified by the educational commission for foreign medical graduates. (*Id.*) He initially trained in anatomic pathology at Conemaugh Memorial hospital in affiliation with Temple University in Pennsylvania from 1995 to 1999. (*Id.*) He subsequently trained in forensic pathology at the office of the chief medical examiner in affiliation with the Medical College of Pennsylvania (now Drexel) from 1999 to 2001. (*Id.*)

Dr. Diaz is currently the Medical Director and Deputy Chief Medical Examiner at the Office of the Chief Medical Examiner in Washington, D.C. (*Id.*) He previously held medical examiner positions in Michigan, and he has held a variety of academic appointments. (*Id.*) He is on a variety of editorial boards for medical publications, and he has extensively presented and published on a variety of areas in pathology. (*Id.*)

Relevant to Defendants' motion to exclude, Dr. Diaz concluded in his expert report that Mr. Gilbert's cause of death should have been forcible restraint inducing asphyxia with arteriosclerotic cardiovascular disease and amphetamine as the underlying factors.[2] (*Id.*) As a basis for this conclusion, Dr. Diaz stated his opinion that Mr. Gilbert was restrained by several individuals in the prone position, and a result of the forcible restraint, he sustained a constellation

---

[2] Dr. Diaz's opinion stands in contrast to the opinions of Dr. Jane Turner, the forensic pathologist and St. Louis City Medical Examiner, who concluded that the manner of death was accidental and that the cause of death was "Arteriosclerotic Heart Disease Exacerbated by Methamphetamine and Forcible Restraint." (Doc. 67-13.) Post mortem testing performed during Dr. Turner's investigation showed that Mr. Gilbert had a large concentration of methamphetamine in his system and that he had significant heart disease. (Doc. 78 ¶¶ 106, 107, 109.)

of injuries in numerous locations that corroborate the physical restraint. (*Id.*) He opined that when an individual is forcibly restrained in a prone position and the weight of the restrainers is applied to the back, a cascade of events occur, the most important of which is a mechanical impairment of breathing that leads to asphyxia. (*Id.*) Thus, Dr. Diaz concluded that the main cause of death should have been forcible restraint inducing asphyxia instead of arteriosclerotic heart disease. (*Id.*)

In further support of his opinion, Dr. Diaz stated in his report that throughout the restraint, Mr. Gilbert was cognizant of his predicament and his struggle with the Officers is a direct reflection of his "air hunger." (*Id.*) Dr. Diaz opined that the post-mortem weight of Mr. Gilbert's lungs suggested significant pulmonary edema. (*Id.*) Dr. Diaz concluded that the pulmonary edema and congestion in Mr. Gilbert's lungs constituted further evidence that his lungs could not exchange air during the restraint and fluid accumulated instead. (*Id.*)

Dr. Diaz further explained in his deposition why he concluded Mr. Gilbert was asphyxiated. He testified that a variety of pieces of information led to his conclusion, including the pulmonary edema on the autopsy report, cerebral edema noted on the autopsy report, testimony of Defendant Officers, other injuries noted in the autopsy report, and the forcible restraint noted on the autopsy as a contributing cause of death. For example, he testified that the pulmonary edema could not be explained by amphetamine use or a cardiac event. (Doc. 65-4 at 52:11–53:19, 58:13–59:4, 64:3–65:9.) He also concluded that the cerebral edema noted on the autopsy report demonstrated the brain swelled up, which is consistent with asphyxia. (*Id.* at 53:20–25.) In rendering his opinion, Dr. Diaz also relied on some testimony from the Officers regarding Mr. Gilbert's breathing patterns. (*Id.* at 65:10–67:25.) In addition, he pointed to the list of injuries in the autopsy report, concluding that all of the injuries noted were indicative of

restraint.  (*Id.* at 55:24–56:5, 62:1–64:2.)  He could not, however, specify where the Defendant

Officers exerted pressure on Mr. Gilbert.  (*Id.* at 68:1–69:25.)  While he could not rule out Mr.

Gilbert's admittedly significant cardiovascular disease or noted chronic methamphetamine use,

Dr. Diaz concluded within a reasonable degree of medical certainty that forcible restraint

inducing asphyxia was the main cause of death.  (*Id.* at 55:24–56:5.)

When specifically questioned about the bases for his opinions, Dr. Diaz testified, "My

opinions are based on my [medical and forensic pathological] experience, and I believe it's a

matter of common sense."  (*Id.* at 75:13–19.)  He also referenced his experience in performing

ten thousand autopsies, his presentations, and his co-authorship on the 2017 *National Association*

*of Medical Examiners Position Paper:  Recommendations for the Definition, Investigation,*

*Postmortem Examination, and Reporting of Deaths in Custody*.  (*Id*. at 76:2–18.)

**B.  Defendants' Experts**

1. Ronald Schwint

Defendants retained Ronald Schwint to provide an opinion on the Defendant Officers'

use of force against Mr. Gilbert and on the SLMPD practices and policies related to this matter.

(Doc. 74-3.)  His report and deposition have been provided to the Court. (Docs. 65-2, 74-3.)

Mr. Schwint has been in law enforcement for over thirty years.  (Doc. 67-41.)  He holds a

Bachelor of Science degree in Criminal Justice and a Master's degree in Educational

Administration of adult and higher education, with a focus on law enforcement training and

reality-based training instructional development.  (*Id.*)  He also received a certificate in

Systematic Curriculum and Instructional Development.  (*Id*.)  Mr. Schwint has served in a

variety of roles in law enforcement, including as a correctional officer, parole agent, patrol

officer, traffic officer, traffic investigator, field supervisor, field training officer, gang task force

officers, urban police rifle rapid deployment team member, verbal Judo instructor, physical conflict resolution instructor, baton and handcuff instructor, and a reality based training instructor. (Docs. 55-1, 67-41.) He developed instructional blocks for patrol officers and supervisors at the Sioux City Falls Police Department (Doc. 67-41), where he was an officer and sergeant from 1991-2012 (Doc. 55-1.) When he retired in 2012, he became a full-time faculty member at Minnesota West Community and Technical College to develop and instruct the college's program for their law enforcement degree program. (Doc. 67-41.) In 2016, he became the coordinator of the law enforcement program at the college, working with the state board of peace officer standards and training and redesigning all the instructional material for the college. (*Id.*)

Mr. Schwint has been actively involved in law enforcement training since 1994. (*Id.*) Since 2004, he has worked as a certified instructor trainer, conducting law enforcement training programs for academies and agencies throughout the United States and Europe. (*Id.*) He has consulted with federal, county, municipal, and security agencies on defensive tactic training programs, policy development, and instructional development. (*Id.*) He has been utilized as an expert witness in areas including instructional design and use of force. (*Id.*) He has dozens of certifications in the area of defensive tactics training. (*See id.*)

Relevant to Plaintiffs' motion to partially exclude Mr. Schwint's testimony, Mr. Schwint testified about "excited delirium."[3] He opined that published reports have found that positional

---

[3] Excited delirium has been "broadly defined as a state of agitation, excitability, paranoia, aggression, and apparent immunity to pain, often associated with stimulant use and certain psychiatric disorders." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1299 n.4 (11th Cir. 2009). *See also* Michael L. Storey, *Explaining the Unexplainable: Excited Delirium Syndrome and Its Impact on the Objective Reasonableness Standard for Allegations of Excessive Force*, 56 St. Louis U. L.J. 633, 638 (2012) (discussing history of excited delirium syndrome).

or compressional asphyxiation is not the major cause of any injury or death.  (Doc. 55-2 at 14:8–25.)  He opined that a lot of the training that officers now receive is not focused on asphyxiation but instead focuses on reading warning signs of restrained individuals going into an acidotic state of excited delirium where they eventually lose consciousness.  (*Id.* at 15:1–18.)  Mr. Schwint explained that during a state of excited delirium, an individual is fighting and the body starts to build up lactic acid, destroying the tissues, degenerating the body, and overwhelming the whole system.  (*Id.*)  He further testified that drugs or a pre-exiting medical condition, such as a heart condition, can exacerbate this deterioration, causing an agitated individual's body to shut down.  (*Id.* at 15:19–25, 16:10–24.)  Thus, opined Mr. Schwint, some research suggests that the individuals actually die from excited delirium, not some other cause or law enforcement intervention.  (*See id.* at 17:4–23.)

Mr. Schwint conceded that he was not a medical doctor, was not giving medical testimony in this case, and was not testifying about what caused Mr. Gilbert's death.  (Doc. 55-2 at 18:1–12.)

### 2. Officer Philip Green

Officer Green was designated by Defendants as an expert in this case.[4]  (Doc. 67-40 at 6:14–18.)  He is an instructor at the City of St. Louis Police Department's policy academy where he teaches, among other things, the use of force and defensive tactics.  (Doc. 67-36.)  He has been an instructor since 2010.  (Doc. 67-40 at 8:22–9:3.)  He trains new recruits and also provides yearly required training for existing officers.  (*Id.* at 7:19–8:3.)  Previous to that, he was a city marshal and patrol officer.  (*Id.* at 8:4–25.)

---

[4]  Officer Green was also designated as the corporate representative of the City of St. Louis in this case.

Officer Green reviewed a variety of documents in connection with his testimony, including some expert reports, expert depositions, and the SLMPD's investigative report. (*Id.* at 10:1–14:15.) Relevant to Plaintiffs' motion to partially exclude his testimony, Officer Green testified that he conducted research on "excited delirium" articles in preparation for his deposition because he believed Mr. Gilbert was suffering from excited delirium during the events with Defendant Officers. (*Id.* at 14:16–24, 17:10–13.) Officer Green defined excited delirium as a condition that manifests itself with self-medication, causing a chemical imbalance in the body resulting in an individual going into a euphoric, delusional, and highly agitated state, requiring intervention. (*Id.* at 14:25–15:10.) Officer Green opined that Mr. Gilbert was experiencing excited delirium and acted out aggressively, manifested in his despondent nature and attempt to hang himself, causing the officers to intervene. (*Id.* at 16:19–17:2.)

Officer Green received some training on excited delirium through the Missouri Crisis Intervention Team, consisting of probably two to four hours of training on excited delirium. (*Id.* at 18:22–19:2, 21:5–7.) Aside from those two to four hours and some personal research, he does not have any other training on excited delirium. (*Id.* at 21:8–13.)

Officer Green testified that excited delirium is considered by some to be a medical diagnosis but others will not classify it as a medical diagnosis because, while the term has been around for a while, it was his view that there is not a huge amount of data on it. (*Id.* at 19:3–18.) He acknowledged that he was not a medical doctor and was not giving any medical opinion in this case. (*Id.* at 19:23–25.)

## II.     Analysis

The Court must act as a gatekeeper for all expert testimony, ensuring that it is "'not only relevant but reliable.'" *Level One Techs., Inc. v. Penske Truck Leasing Co., L.P.*, No. 4:14-CV-

01305-RWS, 2018 WL 5078335, at *1 (E.D. Mo. Oct. 18, 2018) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702. *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012). "The inquiry envisioned by Rule 702 is a flexible one." *Adams v. Toyota Motor Corp.*, 867 F.3d 903, 915 (8th Cir. Aug. 11, 2017), *as corrected* (Aug. 14, 2017). Moreover, "[t]he touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." *Lee v. Andersen*, 616 F.3d 803, 808 (8th Cir. 2010).

Although the proponent of the expert testimony must prove its admissibility by a preponderance of the evidence, *Daubert*, 509 U.S. at 592, Rule 702 "is one of admissibility rather than exclusion." *Shuck v. CNH Am., LLC*, 498 F.3d 868, 874 (8th Cir. 2007). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Olson v. Ford Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007). Proposed expert testimony "must be supported by appropriate validation—i.e., good grounds, based on what is known;" expert "knowledge connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 599 (citation omitted). But any "doubts regarding whether an expert's testimony

will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick*, 150
F.3d 912, 915 (8th Cir. 1998).

The Court has substantial discretion in determining whether expert testimony should be
allowed. *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012). If the Court is "satisfied
with the expert's knowledge, skill, experience, training, or education, and the expert's testimony
is reasonably based on that expertise, admitting the testimony is not an abuse of discretion." *Am.
Modern Home Ins. Co. v. Thomas*, No. 4:16-CV-00215-CDP, 2018 WL 4404723, at *1–2 (E.D.
Mo. Sept. 17, 2018) (citing *Daubert,* 509 U.S. at 588–91 and *Weitz Co. v. MH Washington,* 631
F.3d 510, 527 (8th Cir. 2011)).

**A. Plaintiffs' Experts**

1. Michael Leonesio

Defendants seek to exclude Mr. Leonesio's following testimony: (1) his testimony
regarding what is "reasonable" under the law, that the officers acted "unreasonably" in this
case," and that the force they used was "excessive" or "unnecessary," arguing whether an
officer's use of force is reasonable is a question of law for the Court; (2) his testimony as to what
the officers were thinking, what their justifications were for their actions, or what occurred
between the officers and Mr. Gilbert in the holdover cell, arguing that Mr. Leonesio's testimony
lacks foundation and mixes facts and argument together; and (3) his opinion that the City's
training program is unconstitutional, arguing Mr. Leonesio has no foundation for making such
opinions as he did not know what training officers received. (Doc. 65.) Defendants contend that
Mr. Leonesio's testimony amounts to argument and legal conclusions, usurps the role of the jury,
misstates the law, and lacks foundation. (Doc. 64.)

The Court will address Mr. Leonesio's opinions regarding the reasonableness of the Officers' actions first. Certain categories of expert testimony are not admissible. For example, it is the judge's job to instruct the jury on the applicable law and, thus, expert testimony on matters of law is not admissible. *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). Similarly, "[i]t is well-settled that experts may not offer legal conclusions about a case." *Downing v. Goldman Phipps PLLC*, No. 4:13-CV-00206-CDP, 2017 WL 1047375, at *1 (E.D. Mo. Mar. 20, 2017) (quoting *In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 905 (8th Cir. 2005)) (internal quotations omitted); *see also Morley v. Square, Inc.*, No. 4:10-CV-02243-SNLJ, 2016 WL 1728367, at *1–2 (E.D. Mo. Apr. 29, 2016) (same). Legal conclusions are for the Court to make and are not proper subject for expert testimony. *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) (it was abuse of discretion to allow police-practices expert to testify that officers' conduct comported with Fourth Amendment). By contrast, expert testimony on industry practice or standards is admissible. *S. Pine Helicopters*, 320 F.3d at 841.

Plaintiffs argue Defendants wrongly assert that Mr. Leonesio makes legal conclusions "simply because he uses certain words." (Doc 74.) The Court, however, disagrees. Based on a reading Mr. Leonesio's expert report and deposition testimony as a whole, the Court finds that Mr. Leonesio goes beyond just using "certain words." He states in his report: "I am not a lawyer. I do not offer legal conclusions." (Doc. 74-3.) Yet, as detailed above, he goes on to do just that—concluding in his report that the Officers' use of force was "excessive" and "unnecessary" and repeatedly testifying in his deposition that the Officer's actions were "unreasonable" or did not meet "objective reasonableness" or appropriate governmental interests.

Whether the force used in the course of making an arrest was constitutionally excessive is an issue of law. *Brossart v. Janke*, 859 F.3d 616, 624 (8th Cir. 2017) (citation omitted); *McKenney v. Harrison*, 635 F.3d 354, 359 (8th Cir. 2011) ("Once the predicate facts are established, the reasonableness of the official's conduct under the circumstances is a question of law.") (citation omitted); *Zorich v. St. Louis Cnty.*, No. 4:17-CV-1522-PLC, 2018 WL 3995689, at *2 (E.D. Mo. Aug. 21, 2018) (reasonableness and excessiveness under the Fourth Amendment are questions of law). Thus, an expert's opinion concerning the "reasonableness" or "excessiveness" of an officer's conduct under the Fourth Amendment is an impermissible legal conclusion, not a fact-based opinion. *Shannon v. Koehler*, No. C 08-4059-MWB, 2011 WL 10483363, at *30 (N.D. Iowa Sept. 16, 2011); *see also Elex v. Glirbas*, No. CIV. 12-3206 ADM/JJK, 2014 WL 2462811, at *8 (D. Minn. May 29, 2014) ("expert's opinion on the reasonableness of police conduct in light of Fourth Amendment standards is an impermissible legal conclusion and is not admissible."); *Scherrer v. City of Bella Villa*, No. 4:07–CV–00306-CEJ, 2009 WL 690186, at *3 (E.D. Mo. Mar. 10, 2009) (expert's opinion that use of Taser was unnecessary and inappropriate was inadmissible legal conclusion). Therefore, Mr. Leonesio is not permitted to testify that the Officers' conduct was excessive, unnecessary, or reasonable.

Plaintiffs rely mainly on three cases to support their argument. However, the Court does not find those cases determinative. While the *Wilson* court mentioned a police-procedure expert testified the officers acted reasonably and "suggested" that the officers' beliefs were not objectively reasonable, the admissibility of that expert's testimony was not an issue before the court as it was reviewing the lower court's decision on summary judgment. *See Wilson v. City of Des Moines*, 293 F.3d 447, 453 (8th Cir. 2002). Thus, *Wilson* cannot be read to stand for the proposition that this Court is compelled to admit Mr. Leonesio's testimony. While the *Crawford*

court held it was not an abuse of discretion for the lower court to admit testimony regarding whether an officer acted properly, again, that case does not compel the same conclusion here. *See Crawford v. Bundick*, 32 F. App'x 785, 786–87 (8th Cir. 2002) (per curiam). And while the *Wade* court similarly held it was not an abuse of discretion for the lower court to admit expert testimony regarding whether a correctional officer's actions amounted to an "egregious failure," *Wade v. Haynes*, 663 F.2d 778, 784 (8th Cir. 1981), like *Crawford*, that case does not require the Court here to admit the testimony. The *Wade* court expressly acknowledged "that the issue is a close one" before finding that the decision to admit such evidence was not "manifestly erroneous." *Id.* Here, the Court does not find the issue to be "close" based on Mr. Leonesio's repeated testimony providing legal conclusions on, for instance, reasonableness and governmental interests.

The Court is more persuaded by *Peterson* and its progeny, including some very recent cases within this district addressing the admissibility of police policies and practices expert testimony. In *Peterson*, the Eighth Circuit held that a trial court's admission of a police practices and procedures expert's testimony regarding "his views concerning the reasonableness of the officers' conduct in light of 'Fourth Amendment standards' . . . was not a fact-based opinion, but a statement of legal conclusion." *Peterson*, 60 F.3d at 475. The court concluded that admission of such testimony constituted reversible error. *Id. Peterson* has been repeatedly reaffirmed. *See, e.g.*, *Wilson v. City of Hazelwood, Mo.*, 628 F. Supp. 2d 1063, 1072 (E.D. Mo. 2008) (citing to *Peterson* as authority for holding that to extent testimony regarding the correctness of an officer's conduct was a legal conclusion, such a conclusion is for the court to make); *Barragan v. Tyson Foods, Inc.*, No. C06-4037-DEO, 2008 WL 1776439, at *4–5 (N.D. Iowa Apr. 17, 2008) (noting that federal courts typically prohibit experts from "interpreting" the law or "advising . . .

how the law should apply to the facts of the case" and concluding that "[v]irtually every circuit court that has addressed this question has agreed with the holding[] in . . . *Peterson*"); *Schmidt v. City of Bella Villa*, No. 4:06-CV-00265-SNL, 2007 WL 2159469, at *2 (E.D. Mo. July 26, 2007), *aff'd*, 557 F.3d 564 (8th Cir. 2009) (discussing *Peterson* as authoritative in holding that police practices and procedures expert's opinions regarding whether an officer's post-arrest behavior was reasonable pursuant to Fourth Amendment standards under the alleged circumstances "are not helpful to the jury as trier of fact, but rather, impose his legal conclusions on the jury" and thus were excluded as "legal conclusions outside the realm of admissible expert testimony").

Moreover, within the past year, multiple cases within this district have reaffirmed *Peterson* and excluded police practices and procedures expert testimony in section 1983 cases for amounting to improper legal conclusions.  *See, e.g.*, *Zorich*, 2018 WL 3995689, at *3 (excluding police policies and practices expert's testimony regarding the reasonableness of the defendant officers' actions as legal conclusions that invade the province of the jury); *Swink v. Mayberry*, No. 4:17-CV-00791-PLC, 2018 WL 2762549, at *3 (E.D. Mo. June 8, 2018) (excluding police pursuit practices expert's opinion regarding whether the officers' actions were reasonable under the totality of the circumstances and in light of Fourth Amendment standards, and further holding expert's report and deposition could not be admitted at trial because they were "inextricably linked with topics upon which he may not opine"); *Sloan v. Long*, No. 4:16-CV-00086-JMB, 2018 WL 1243664, at *3 (E.D. Mo. Mar. 9, 2018) (excluding police policy and practices expert's opinion that an officer's use of force was unnecessary, unreasonable, or punitive and served no objectively unreasonable purpose as impermissible legal conclusion). While "expert opinions 'can embrace the ultimate issue of *fact* . . . including whether standards

or practices are applicable to a given situation and whether those standards or practices were met in the situation [under Federal Rule of Evidence 704,] . . . an expert cannot testify that following or failing to follow certain standards met or failed to meet the applicable *legal* standard, such as the reasonableness of [the defendant officer's] actions.'" *Sloan*, 2018 WL 1243664, at *4 (internal citations omitted) (emphasis in original).

Consistent with those cases, the Court finds that Mr. Leonesio's testimony goes beyond just embracing the ultimate issues. It is not useful to the jury but, rather, imposes his legal conclusions on the jury. Like in those cases, therefore, the Court will decline to permit Mr. Leonesio, either through his report, deposition, or other testimony, to offer legal conclusions that touch upon the ultimate legal issues in this case, i.e., whether Defendants' actions were excessive, unnecessary, or otherwise unreasonable under the totality of the circumstances and in light of Fourth Amendment standards.

However, "'a police procedure expert's testimony may be proper on issues other than the reasonableness of an officer's conduct under Fourth Amendment standards.'" *Sloan*, 2018 WL 1243664, at *3 (quoting *Shannon*, 2011 WL 10483363, at *30). "The role of such an expert 'is to contextualize the evidence the jury will hear about the use of force by the defendant against the plaintiff, in light of the standards practiced by officers throughout the country.'" *Sloan*, 2018 WL 1243664, at *3 (citations omitted). To the extent that Plaintiff proffers Mr. Leonesio's testimony to discuss the generally recognized standards and practices for using force under the circumstances of this case, such testimony would be admissible.[5] *See, e.g.*, *Swink*, 2018 WL 2762549, at *3 (allowing police practices expert's testimony on general prevailing standards and

---

[5] The Court reserves the right to further limit Mr. Leonesio's testimony in this regard, as the Court is not fully convinced at this point that Plaintiffs have laid the proper foundation for Mr. Leonesio to discuss prevailing standards for the use of force in secured facilities versus in-field situations, which is the crux of his opinion. (*See* 74-3, 65-2 at 88:15–90:4.)

policies in the field of law enforcement with respect to the use of force in vehicular pursuits); *Sloan*, 2018 WL 1243664, at \*4 (allowing police policy and practices expert to testify about national standards and offer opinions as to how those standards should manifest in hypothetical situations, including that mirroring the version of events giving rise to the action, and to testify "generally" on the proper methods for securing a suspect).

The Court will next address Defendants' arguments that Mr. Leonesio's testimony as to what the officers were thinking, what their justifications were for their actions, or what occurred between the officers and Mr. Gilbert in the holdover cell should be excluded. Plaintiffs argue Mr. Leonesio should be able to testify about the underlying facts in this case. To the extent Mr. Leonesio speculates about what happened, however, such as whether Mr. Gilbert intentionally or unintentionally kicked an officer, such testimony invades the province of the jury and will be excluded. *See, e.g.*, *Sloan*, 2018 WL 1243664, at \*4 (excluding police policy and practices expert's conclusion that the plaintiff was compliant and unlikely to be attempting to strike the officer because it "improperly assesses the credibility of the witness and invades the province of the jury");[6] *see also Boude v. City of Raymore*, 855 F.3d 930, 933–34 (8th Cir. 2017) (qualified immunity does not depend on whether the individual's actions were "*in fact*" innocent, but, rather, "the key" is whether the officers reacted reasonably to the circumstances as they appeared

---

[6] Importantly, the judge in *Sloan* noted:

> It is settled law that "an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert." *Williams v. Illinois*, 567 U.S. 50, 57 (2012). "However, '[t]here is a critical distinction between an expert testifying that a disputed fact actually occurred or that one witness is more credible than another and an expert giving an opinion based upon factual assumptions, the validity of which are for the jury to determine. The former is manifestly improper, the latter is not.'" *Thomas v. Barze*, 57 F. Supp. 3d 1040, 1059 (D. Minn. 2014) (quoting *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006)).

*Sloan*, 2018 WL 1243664, at \*4.

to the officers) (emphasis in original).  Nor may Mr. Leonesio testify that Plaintiffs' version of the facts is true.  *See*, *e.g.*, *Swink*, 2018 WL 2762549, at *3 (excluding police practices expert's testimony to the extent he opined that the plaintiff's versions of the facts was true).  Moreover, citing *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993), Plaintiffs admit the relevant question is whether the actions were unreasonable "without regard to [an officer's] underlying intent or motivation."  (Doc. 74.)  To the extent Dr. Leonesio testifies about the Officers' motive, i.e., that their intent was to keep him from moving, the Court will exclude such testimony as speculative and irrelevant.  In ascribing a motive for the Officers' actions, Dr. Leonesio testimony and opinion went beyond the facts.

Finally, as the Court has granted summary judgment under separate Order on the claims against the City, including relating to its training, Mr. Leonesio's testimony in this regard is now moot.   However, the Court is skeptical whether Mr. Leonesio had the proper foundation to render opinions in this regard, as he testified "I don't know what training they had," "I didn't see it," and "I didn't look at their training, I didn't have access to that," "I don't know what their training looks like" and speculated "it seems to be they're all using the same training because they are all pretty much acting very, very similarly."  (Doc. 65-2 at 111:19–112, 113:12–14, 114:2–115:22.)  Plaintiffs argue that Defendants' argument "defies reason" because Defendants' corporate representative and expert confirmed there are no policies or procedures that tell officers what to do when force is required in a jail/holding facility.  (Doc. 74.)  Yet Plaintiffs fail to lay any foundation by indicating that Mr. Leonesio reviewed this testimony and was aware of this purported absence.  Nor did Mr. Leonesio testify that he reviewed the relevant training materials and thought necessary training was missing.  Instead, he seems to have been provided no access and to have reviewed nothing.  Thus, Mr. Leonesio has failed to articulate a proper

basis for making his opinion. In other words, it is improper for him to conclude that the City failed to do something when he did not actually review what they did.

Moreover, Mr. Leonesio's ultimate opinion that the City's "lack of training led to the deprivation of Mr. Gilbert's constitutional rights" is an improper and excludable legal conclusion. *See*, *e.g.*, *Swink*, 2018 WL 2762549, at *3 (excluding police practices expert's testimony regarding whether the City failed to train as a question of law reserved for resolution by the court rather than the trier of fact); *Jones v. Slay*, No. 4:12-CV-2109 CAS, 2014 WL 2804407, at *8, 11 (E.D. Mo. June 20, 2014) (finding "[a] determination that a defendant's conduct constitutes a constitutional violation is a legal conclusion" and holding police policies and procedures expert "may not opine that any of the defendants' conduct violated a constitutional right or norm").

For these reasons, Mr. Leonesio's opinions and testimony will be excluded in part and allowed in part as set forth above.

2. <u>Dr. Francisco Diaz</u>

Defendants argue the Court should exclude the testimony of Dr. Diaz because it is unreliable and lacks foundation. (Doc. 64.) More specifically, Defendants argue that the Court should prevent Dr. Diaz from opining that Mr. Gilbert was asphyxiated by the Officers because Dr. Diaz could not point to any articles or literature to support his claims and relied solely on his experience to defend his opinions. (Doc. 65.) Defendants content there are scholarly articles, cited to by their expert Dr. Jane Turner, showing that post-mortem pulmonary edema can be caused by factors other than asphyxia. (*Id.*) Dr. Diaz's opinions, in contrast, have not been tested and are undermined by medical texts. (*Id.*) Therefore, Defendants argue, Plaintiffs cannot show his opinions are reliable. (*Id.*) Plaintiffs counter that Dr. Diaz relied on his vast

experience, literature showing reliable methods of investigating and examining deaths in custody, and a variety of other facts and data to determine Mr. Gilbert died due to asphyxiation caused by the officers' forcible restraint.  (Doc. 74.)

Factors relevant to the reliability and relevancy determinations include:  "(1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community."  *Russell*, 702 F.3d at 456 (citations omitted).  Additional factors include "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

"[T]he *Daubert* reliability factors should only be relied upon to the extent that they are relevant and the district court must customize its inquiry to fit the facts of each particular case." *Shuck*, 498 F.3d at 874 (8th Cir. 2007); *see also Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005) (stating the "evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands").  The inquiry envisioned by 702 is designed to exclude "vague theorizing based on general principles" or "unsupported speculation," but not requiring an opinion to be "a scientific absolute in order to be admissible." *Adams*, 867 F.3d at 915–16.  An expert opinion "should be liberally admitted if it rests upon good grounds, based on what is known, and doubts about the usefulness should be resolved in favor of admissibility."  *Hill v. Sw. Energy Co.*, 858 F.3d 481, 485 (8th Cir. 2017)

(citation omitted).  *See Bates v. Delmar Gardens N., Inc.*, No. 4:15-CV-00783-AGF, 2017 WL 4038132, at *8–9 (E.D. Mo. Sept. 13, 2017).

Defendants do not challenge Dr. Diaz's qualifications.  Therefore, the Court assumes Dr. Diaz is qualified to render the opinions he gave, including on asphyxia and edema.  Considering the factors above, the Court will allow Dr. Diaz to testify regarding asphyxiation.  In reviewing the record, the Court concludes that Dr. Diaz's expert testimony regarding asphyxiation rests on a reliable foundation.  Dr. Diaz relied on information from a variety of sources, including the pulmonary edema on the autopsy report, cerebral edema noted on the autopsy report, testimony of Defendant Officers, other injuries noted in the autopsy report, and the forcible restraint noted on the autopsy as a contributing cause of death.  Applying his uncontested extensive background knowledge of medicine and forensic pathology, he reviewed this information and concluded that asphyxia was the main cause of Mr. Gilbert's death.  *See Watson-Nance v. City of Phoenix*, No. CV-08-01129-PHX-ROS, 2011 WL 13152466, at *12 (D. Ariz. June 16, 2011) (noting that federal courts have "routinely allowed" expert testimony on asphyxia).

Therefore, the Court will err on the side of admissibility.  Dr. Diaz specifically pointed to one article only in support of his opinions, an article he co-authored entitled *National Association of Medical Examiners Position Paper:  Recommendations for the Definition, Investigation, Postmortem Examination, and Reporting of Deaths in Custody*.  (Doc. 65-4 at 76:2–18.)  While that article does not address asphyxia or pulmonary edema in connection with in-custody deaths, the article does advocate for a methodology to determine the cause of deaths in custody, including "investigation into the facts and circumstances surrounding the death," "whether the decedent was restrained," "the height and weight of the officers with their gear and the positions/locations on the decedent's body where pressure was applied and for how long,"

and "information about whether anyone was monitoring breathing and pulse." (Doc. 74-7.) *See*, *e.g.*, *Watson-Nance*, 2011 WL 13152466, at *12 (forensic expert need not proffer specific study on asphyxia and could rely on general medical publications). Moreover, Dr. Diaz did not rely solely on his experience. As noted above, he relied on a variety of sources. Viewing his opinions and testimony in total, and bearing in mind that any doubts should be resolved in favor of admissibility, the Court is satisfied with Dr. Diaz's methodology. *See*, *e.g.*, *Lewis v. City of Hayward*, No. C 03-5360 CW, 2006 WL 436134, at *5 (N.D. Cal. Feb. 21, 2006) (admitting testimony of forensic expert, who disagreed with coroner's cause of death, when forensic expert concluded death was caused by asphyxia and based his opinion on restraint used by officers and injuries decedent sustained); *Bornstad ex rel. v. Honey Brook Twp.*, No. C.A.03-CV-3822, 2005 WL 2212359, at *11 (E.D. Pa. Sept. 9, 2005), *aff'd sub nom. Bornstad v. Honey Brook Twp.*, 211 F. App'x 118 (3d Cir. 2007) (holding forensic expert's opinion identifying asphyxia as cause of death was reliable when expert compiled information from several sources, including autopsy report and witness interviews, and when expert excluded other causes such as coronary vascular disease and drug use).

The Court understands that different pathologists might review the same data and arrive at different conclusions, as Dr. Diaz and Dr. Turner did here. This disagreement, however, does not make Dr. Diaz's methods unreliable. *See*, *e.g.*, *Olson*, 481 F.3d at 626 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Am. Modern Home*, 2018 WL 4404723, at *1 ("A party's mere disagreement with an expert's assumptions and methodologies does not warrant exclusion of expert testimony. . . . If a party thinks other assumptions and methodologies are more appropriate, it may make this apparent

through cross-examination and its own expert witnesses.") (citing *David E. Watson, P.C.*, 668 F.3d at 1015).

However, the Court will exclude Dr. Diaz's opinion that Mr. Gilbert's "struggle" during the encounter with Defendant Officers "is a direct reflection of his 'air hunger.'" (Doc. 74-6; see also Doc. 65-4 at 71:5–72:22.) Plaintiffs repeatedly use Dr. Diaz's statements to argue that Mr. Gilbert was not resisting or ignoring commands or being violent, but was just opening up his lungs to breathe, an act known as "air hunger." (*See, e.g.*, Doc. 78 ¶ 58.) While Dr. Diaz may testify that the medical evidence and cause of death is consistent with air hunger/asphyxiation, Dr. Diaz impermissibly takes his opinion a step further in opining that Mr. Gilbert's actions evidencing a struggle with the Officers were a result of air hunger, with the implication that Mr. Gilbert was not resisting at some point.[7] The Court finds that this improperly invades the province of the jury.[8] *See, e.g.*, *Sloan*, 2018 WL 1243664, at *4 (excluding expert's conclusion that the plaintiff was not resisting because it "improperly assesses the credibility of the witness and invades the province of the jury"); *Swink*, 2018 WL 2762549, at *3 (excluding police practices expert's testimony to the extent he opined about "what happened" or that the plaintiff's

[7] Dr. Diaz testified: "What part of it is resisting arrest or being combative and at what point did he turn into desperation for air hunger and what percentage is which and at what point did the percentage go ninety-five percent on air hunger and five percent on the other side? I cannot answer that and neither the officers." (Doc. 65-4 at 72:14–21).

[8] Though Defendants have not raised the specific argument and just generally seek to exclude Dr. Diaz's opinions, to the extent that Dr. Diaz otherwise opines or testifies by speculating or drawing conclusions about the facts, the Court will exclude such testimony. For example, Dr. Diaz testified, without providing the factual predicate, "I think a significant amount of time happened." (Doc. 74-8 at 63:22–25.) As another example, Dr. Diaz testified: "And he was moved to his side. So what that tells you is before that he was prone and no pulse. So basically he is dead." (*Id.* at 67:15–17.) He also testified "Several minutes passed here he was in that position where he couldn't breathe properly. He's gasping for air." (*Id.* at 61:22–25.) The Court finds that such expert testimony that a fact actually occurred is manifestly improper. *See supra* n.6.

versions of the facts was true); *see also Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012)

(when detainee "characterize[d] his struggles [of neither remaining still nor stopping moving

while being handcuffed] merely as an effort to breathe," finding "even if [his] motive was

innocent, the [officers] reasonably could have interpreted [his] actions as resistance and

responded with an amount of force that was reasonable to effect the arrest").

      For these reasons, Dr. Diaz's opinions and testimony will be excluded in part and allowed

in part as set forth above.

**B. Defendants' Experts—Excited Delirium**

      Plaintiffs seek to partially exclude the expert testimony of Mr. Schwint and Officer Green

regarding excited delirium.  Plaintiffs argue that Mr. Schwint's testimony should be excluded

because excited delirium is a medical diagnosis, but Mr. Schwint is not a medical doctor.  (Doc.

55.)  Plaintiffs assert that Officer Green's testimony should be excluded because he is not an

expert in excited delirium and is not qualified to give medical opinions in this case.  (Doc. 56.)

Defendants argue that excited delirium is not a medical diagnosis, so the fact that Mr. Schwint

and Officer Green are not doctors has no bearing on the issue.  (Doc. 71.)  Defendants point to

the testimony of Plaintiff's expert, Mr. Leonesio, who testified that "it's not a medical diagnosis.

It's just a descriptive term, really, more than anything."  (Doc. 71-1 at 30:13–18.)  Plaintiffs

counter that Defendants only dispute whether excited delirium is a medical diagnosis but fail to

demonstrate that Mr. Schwint and Officer Green are qualified to testify on the subject.  (Doc.

73.)

      It is well settled that "it is the responsibility of the trial judge to determine whether a

particular expert has sufficient specialized knowledge to assist jurors in deciding the specific

issues in the case."  *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.,* 254 F.3d

706, 715 (8th Cir. 2001).  Moreover, "[o]nce initial expert qualifications and usefulness to the

jury are established, . . . a district court must continue to perform its gatekeeping role by ensuring

that the actual testimony does not exceed the scope of the expert's expertise, which if not done

can render expert testimony unreliable . . . ." *Id.*

　　At least one circuit has recognized that "[a]lthough not a validated diagnostic entity in

either the International Classification of Diseases or the Diagnostic and Statistical Manual of

Mental Disorders, 'excited delirium' is a widely accepted entity in forensic pathology and is

cited by medical examiners to explain the sudden in-custody deaths of individuals who are

combative and in a highly agitated state."  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1299 n.4

(11th Cir. 2009) (citing Carolyn B. Robinowitz, MD, Report of the Council on Science and

Public Health 453 (American Medical Association, annual meeting 2009)).  While the exact

mechanism seems to be unknown, "[s]peculation about triggering factors include[s] sudden and

intense activation of the sympathetic nervous system, with hyperthermia, and/or acidosis, which

could trigger life-threatening arrhythmia in susceptible individuals."  *Id.*

　　There have been instances where courts have referenced non-medical examiner testimony

regarding excited delirium.  *See*, *e.g.*, *Thompson v. Cope*, 900 F.3d 414, 426 (7th Cir. 2018)

(court noted parties did not dispute responding paramedic's conclusion in § 1983 action that

decedent was in a state of excited delirium); *Callwood v. Jones*, 727 F. App'x 552, 554 (11th Cir.

2018) (considering responding officer's testimony that arrestee was suffering from excited

delirium in ruling on summary judgment); *Mingo v. City of Mobile*, 592 F. App'x 793, 797–98

(11th Cir. 2014) (court referenced testimony of the plaintiff's expert, a police officer with

twenty-five years of experience, who criticized officers for not recognizing the signs of excited

delirium); *Dyer v. Blankenship*, No. 4:07-CV-02105-AGF, 2011 WL 1226941, at *8-9 (E.D. Mo. Mar. 30, 2011) (referencing training officers received relating to excited delirium).

However, excited delirium seems to be most often discussed in relation to a pathologist/medical examiner's conclusion. *See, e.g.*, *Mingo v. City of Mobile*, 592 F. App'x 793, 797 (11th Cir. 2014) (state medical examiner concluded in § 1983 case that cause of death was excited delirium); *Hoyt v. Cooks*, 672 F.3d 972, 976 (11th Cir. 2012) (cause of death in §1983 case listed as cocaine-induced excited delirium); *Mann*, 558 F.3d at 1304 (plaintiff's medical expert opined that arrestee's death caused by excited delirium); *Grayson v. Ross*, 454 F.3d 802, 808 (8th Cir. 2006) (noting pre-trial detainee died of excited delirium as a result of acute methamphetamine intoxication and physical struggle, with idiopathic cardiomyopathy as a contributing condition); *Dyer*, 2011 WL 1226941, at *8 (noting medical examiner determined cause of death was excited delirium with cocaine and methamphetamine). *See also Estate of Barnwell v. Roane Cnty., Tenn.*, No. 3:13-CV-124-PLR-HBG, 2016 WL 1457928, at *3 (E.D. Tenn. Apr. 12, 2016) (refusing to exclude forensic pathologist's testimony regarding excited delirium); *Galack v. PTS of Am., LLC*, No. 4:13-CV-0288-HLM, 2015 WL 5692327, at *18 (N.D. Ga. July 6, 2015) (same).

Without deciding the question of whether excited delirium is a proper medical diagnosis and otherwise a generally acceptable topic for expert opinion,[9] the Court finds that the testimony of Mr. Schwint and Officer Green regarding excited delirium should be excluded. Defendants have failed to meet their burden of demonstrating that Mr. Schwint and Officer Green are

_____

[9] If the Court were to assume or otherwise conclude that excited delirium is a medical diagnosis, Mr. Schwint and Officer Green would be even more clearly unqualified to testify about excited delirium, as neither are doctors, and there is no other indication that they have any other medical background. Indeed, Mr. Schwint testifies repeatedly regarding medical terms and processes such as lactic acidosis, yet Defendants did not establish his qualifications to offer such testimony.

qualified by their knowledge, skill, experience, training, or education to testify about excited delirium.

Officer Green's knowledge or training regarding excited delirium consists solely of two to four hours of training and some limited personal research performed in connection with the current litigation. The Court finds that this is not sufficient to meet the Rule 702 standards. Importantly, moreover, Officer Green conceded that he was not an expert on excited delirium, testifying "I am far from an expert on it." (Doc. 67-40 at 18:22–19:2, 21:14–16.)

While Mr. Schwint has a lengthy history as an officer and instructor, Defendants offer no evidence that he has ever received any training or education or has any other knowledge outside of the this litigation regarding excited delirium. The Court finds no mention of excited delirium in Mr. Schwint's curriculum vitae or expert report, and Defendants have not offered any other testimony laying the foundation for his opinion on excited delirium. Instead, Defendants merely assert in their very short response, without further argument or elaboration, that the fact that Mr. Schwint is not a doctor has no bearing on whether he should be allowed to testify. Therefore, the Court, exercising its gatekeeping function, will exclude both experts' conclusions regarding excited delirium, finding Defendants have not met their burden of admissibility.

The Court does recognize that other courts have acknowledged the symptoms of excited delirium can include behaviors such as imperviousness to pain, great strength, bizarre behavior, aggression, hallucinations, agitation, and excitability. *See*, *e.g.*, *Mann*, 588 F.3d at 1299 n.4; *Hoyt*, 672 F.3d at 979 n.7. As such behaviors would be recognizable to lay person, Mr. Schwint and Officer Green are not prevented from discussing such behaviors, if any, in connection with their opinions, to the extent such testimony is other admissible and not excluded. They may not,

however, provide the ultimate conclusion that any such behaviors demonstrated Mr. Gilbert was in a state of excited delirium.

### III.    Conclusion

For the foregoing reasons, Plaintiffs' expert Michael Leonesio may testify regarding the generally recognized standards and practices for using force under the circumstances of this case. However, he may not offer opinions or conclusions that touch upon the ultimate legal issues in this case, including whether Defendants' actions were excessive, unnecessary, or otherwise unreasonable under the totality of the circumstances and in light of Fourth Amendment standards. Moreover, Mr. Leonesio may not speculate regarding what the Officers were thinking, offer opinions regarding what their justifications or motives were for their actions, or otherwise speculate about what occurred between the Officers and Mr. Gilbert in the holdover cell. Finally, Mr. Leonesio may not offer opinions regarding whether the City's training program was unconstitutional. Plaintiffs' expert Dr. Francisco Diaz may offer testimony regarding whether the medical evidence and Mr. Gilbert's cause of death is consistent with asphyxiation but may not offer opinions regarding whether Mr. Gilbert's struggle during the encounter with the Officers resulted from air hunger and not resistance. Defendants' experts, Mr. Ronald Schwint and Officer Philip Green, may offer testimony regarding behaviors Mr. Gilbert exhibited that would be recognizable to a lay person but may not offer any opinions regarding whether these behaviors meant Mr. Gilbert exhibited excited delirium.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion and Memorandum in Support to Partially Exclude the Expert Testimony of Defendant's Expert Ronald Schwint (Doc. 55) is **GRANTED, in part, and DENIED, in part.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion and Memorandum in Support to Partially Exclude the Expert Testimony of Officer Philip Green (Doc. 56) is **GRANTED, in part, and DENIED, in part.**

**IT IS FINALLY ORDERED** that Defendants' Motion to Exclude Expert Testimony (Doc. 64) is **GRANTED, in part, and DENIED, in part.**

Dated this 1st day of February, 2019.

_\_\_\_ /s/ Noelle C. Collins _____
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE