| | | |
|---|---|---|
| **JODY LOMBARDO and** | ) | |
| **BRYAN GILBERT,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 4:16-CV-01637-NCC** |
| **v.** | ) | |
| | ) | |
| **SAINT LOUIS CITY, RONALD BERGMANN,** | ) | |
| **JOE STUCKEY, PAUL WACTOR,** | ) | |
| **MICHAEL COGNASSO, KYLE MACK,** | ) | |
| **ERICH VONNIDA, BRYAN LEMONS,** | ) | |
| **ZACHARY OPAL, JASON KING,** | ) | |
| **and RONALD DEGREGORIO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 63).[1] The Motion is fully briefed and ready for disposition. For the following reasons, Defendants' Motion for Summary Judgment will be **GRANTED.**

## I. Legal Standard

Summary judgment is appropriate when no genuine issue of material fact exists in the case and the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The initial burden is placed on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). If the record demonstrates that no genuine issue of fact is in dispute, the burden then shifts to the non-moving party, who must set forth affirmative evidence and specific facts showing a genuine dispute on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In determining whether

---

[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. 636(c)(1) (Doc. 12).

summary judgment is appropriate in a particular case, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. *Benford v. Correctional Medical Services*, No. 1:11CV121 JAR, 2012 WL 3871948, at *4 (E.D. Mo. Sept. 6, 2012) (citing *Celotex Corp.*, 477 U.S. at 331).  The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial.  *Id.* (citing *Anderson*, 477 U.S. at 249).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.* (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)).

## II. Background and Undisputed Facts[2]

On October 20, 2016, Plaintiffs Jody Lombardo and Bryan Gilbert ("Plaintiffs") filed a twenty-count action pursuant to 42 U.S.C. § 1983 and Missouri state law against the City and Police Officer Defendants.  On December 8, 2015, Plaintiffs' son, Nicholas Gilbert ("Mr. Gilbert"), died while in the custody of the Saint Louis Metropolitan Police Department ("SLMPD").  There were multiple SLMPD officers involved in the incident, all of whom are named Defendants in the lawsuit along with the City of St. Louis ("City").  Those Officers include:  Ronald Bergmann ("Seargant Bergmann"), Michael Cognasso ("Officer Cognasso"), Roland DeGregorio ("Officer DeGregorio"), Jason King ("Officer King"), Bryan Lemons ("Officer Lemons"), Kyle Mack ("Officer Mack"), Zachary Opel ("Officer Opel"), Joseph Stuckey ("Officer Stuckey"), Erich vonNida ("Officer vonNida"), and Paul Wactor ("Officer

---

[2]  The Court's recitation of facts is taken mainly from Plaintiffs' Responses to Defendants' Statement of Uncontroverted Material Facts (Doc. 78) and Defendants' Response to Plaintiffs' Statement of Additional Material Facts (Doc. 86).  The Court also considered the exhibits submitted by the parties, where appropriate, in making its decision.

Wactor").[3]

Plaintiffs contend that Mr. Gilbert's death was the direct result of the use of excessive force (Counts V, VII, IX, XII, XIII, XV, XVI, XVII, and XVIII), a deliberate indifference to his need for medical care (Counts VI, VIII, X, XIV, and XIX), and negligence by Defendants (Count XX). Plaintiffs further allege that the City is liable for the death of Mr. Gilbert because its policies, customs, and practices caused the deprivation of Mr. Gilbert's constitutional rights and thus his death (Counts I-IV).

This Court previously dismissed Count XX against the City as well as the official capacity claims against all of the named Police Officer Defendants. (Doc. 22.) In Plaintiffs' response to the Motion for Summary Judgment, Plaintiffs indicated they are not pursuing their claims for deliberate indifference to medical needs or common law negligence claims. They, therefore, consent to dismissal of Counts IV, VI, VIII, X, XIV, XIX, and XX. (Doc. 79.)

Thus, the Counts that remain are as follows: the § 1983 Counts against the City based on its policies, practices, protocols, customs, procedures, and training (Counts I-III) and the § 1983 Counts against each named Police Officer Defendant in their individual capacity based on the alleged use of excessive force in violation of the Fourth and Fourteenth Amendments (Counts V, VII, IX, XI, XII, XIII, XV, XVI, XVII, and XVIII).[4]

---

[3] Because the Defendant Officers were named as individual defendants, the Court considers each Officers' conduct separately in this section and throughout this Order. *Wilson v. Northcutt,* 441 F.3d 586, 591–92 (8th Cir. 2006) ("each defendant's conduct must be independently assessed" in considering a multi-defendant motion for summary judgment on grounds of qualified immunity because liability for damages for a federal constitutional tort is personal).

[4] In asserting the Fourteenth Amendment, Plaintiffs appear to seek redress under Fourteenth Amendment's substantive due process clause for violations of Mr. Gilbert's Fourth Amendment (excessive force) rights. However, the Supreme Court has made clear that *substantive* due process is not the appropriate vehicle for claims where, as here, there is a more definite constitutional provision that protects against certain government behavior. *Cnty. of Sacramento*

**A. The Events in the Holdover Cell**

The undisputed facts are as follows. On December 8, 2015, at approximately 1:35 p.m., Nicholas Gilbert ("Mr. Gilbert") was arrested by SLMPD officers on suspicion of trespassing and occupying a condemned building and for failing to appear in court for an outstanding traffic violation, a misdemeanor. After his arrest, Mr. Gilbert, who was five feet three inches tall and weighed 160 pounds, was brought to the holdover in the SLMPD's central patrol station. The holdover is a secure holding facility within the SLMPD's central patrol station where prisoners are kept on a temporary basis before being transported to the City's Justice Center downtown. The holdover is comprised of a booking area, where the clerk sits behind a semicircular desk, a main holding cell where prisoners are kept before they are booked, and a locked cell block with eight individual cells for prisoners after they have been booked. In the central patrol holdover, Mr. Gilbert was placed in the main holding cell. During the booking process, Mr. Gilbert was cooperative, and he checked "no" to a question asking whether he had any medical condition of which the police should be aware. After he was booked, Mr. Gilbert was transferred from the main holding cell to an individual cell. (Doc. 78 ¶¶ 13-16, 22, 24, 25, 26, 31; Doc. 86 ¶¶ 1, 3.)

There were several officers in the holdover area at this time, including Officers King, Wactor, DeGregorio, and Stuckey. Officer King, who was in the holdover assisting a probationary officer with the booking process, observed Mr. Gilbert in his cell, grabbing at the air. Mr. Gilbert's behavior struck Officer King as unusual. Officer Wactor, who was also in the holdover area at the time, had observed Mr. Gilbert waving his hands in the air "almost like he

---

*v. Lewis*, 523 U.S. 833, 854 (1998). As such, the Court will analyze the claims directly under the Fourth Amendment, as applied to state actors and pretrial detainees through the Fourteenth Amendment Due Process Clause, rather than as substantive due-process claims. *See Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473; *Walton v. Dawson*, 752 F.3d 1109, 1117–18 (8th Cir. 2014); *Ryan v. Armstrong*, 154 F. Supp. 3d 798, 807 (D. Minn. 2016), *aff'd in part, rev'd in part on other grounds*, 850 F.3d 419 (8th Cir. 2017).

was practicing some type of martial arts." Officer Stuckey, who was in the holdover behind the desk preparing paperwork for a prisoner transport run, had briefly noticed Mr. Gilbert acting strangely, rattling the bars of his cell, throwing his shoe, and bobbing up and down. Officer Stuckey noticed behavior from Mr. Gilbert that he associated with Organic Brain Syndrome.[5] (Doc. 86 ¶ 84.) However, Officer Stuckey had only glanced at Mr. Gilbert for a second or two, had no contact with him, and had no idea whether he had mental problems. (Doc. 78 ¶¶ 31–32, 36, 42, 37, 43.)

After Officer King observed Mr. Gilbert grab at the air and when he looked up again after attending to his probationary officer, Officer King noticed that Mr. Gilbert was tying an article of clothing around the bars of his cell and putting it around his neck. Upon seeing Mr. Gilbert tie an article of clothing around the bars of his cell and to his neck, Officer King stated that Mr. Gilbert appeared to be trying to hang himself. Officers DeGregorio, Stuckey, and Wactor were in the holdover at the time that Officer King made that statement. Upon hearing Officer King, Officer Wactor went to notify a supervisor. Upon hearing Officer King, Officer DeGregorio looked up from his paperwork and saw Mr. Gilbert with clothing tied around his neck and connected to the top bars of his cell. Thereafter, Officer DeGregorio proceeded, like Officer Wactor, to attempt to alert a supervisor of the situation. And upon hearing officers state that Mr. Gilbert was trying to hang himself, Officer Stuckey, who was sitting in the holdover behind the clerk's desk, turned around and saw that Mr. Gilbert had an article of clothing around his neck. (Doc. 78 ¶¶ 31–33, 36, 38, 40–44.)

---

[5] Officer Stuckey testified that "his understanding and knowledge of OBS is a common term that's used throughout the department to identify someone that could have mental issues, could be highly agitated, could be on chemical substance." (Doc. 67-8, at 28:12–16.) Plaintiffs state it has been described as a general moniker used by officers to describe individuals exhibiting signs of impaired mental function. (Doc. 86 n.2.)

Officer Stuckey requested Ms. Veronica Wilburn, the clerk who booked Mr. Gilbert, to unlock the secure door to the cell block so that he could respond to Mr. Gilbert's cell. Officer Stuckey proceeded to Mr. Gilbert's cell, and he was followed by Officer DeGregorio and by Sergeant Bergmann, a supervisor who had just entered the holdover and been advised that Mr. Gilbert was attempting to harm himself. (Doc. 78 ¶¶ 45, 46–47.)

As Officer Stuckey approached Mr. Gilbert's cell, the cell door opened.[6] When the cell door opened, Mr. Gilbert did not have any clothing tied to his neck. Early in the encounter, Mr. Gilbert had his hands up.[7] Officer Stuckey then grabbed Mr. Gilbert by his left wrist and attempted to spin him around to handcuff him. He was able to cuff Mr. Gilbert's left wrist, but Mr. Gilbert evaded having his right wrist cuffed, and he began to struggle with Officer Stuckey and with Officer DeGregorio and Sergeant Bergmann, who had arrived in the cell as well. During the struggle, Mr. Gilbert was brought to a kneeling position over a concrete bench inside the cell. Officer DeGregorio attempted to control Mr. Gilbert by grabbing his left bicep and left

---

[6] The parties dispute whether Mr. Gilbert was inside or outside of the cell at this point (*See* Doc. 78 ¶¶ 49–50.) The Court finds this immaterial, as it is undisputed that the Officers were responding to Mr. Gilbert's apparent attempt to hang himself and that Mr. Gilbert attempted to evade the officers when they arrived. (Doc. 78 at ¶¶ 33–47, 52–53.) Moreover, this is not relevant under the applicable case law discussed *infra*.

[7] While it is undisputed that Mr. Gilbert had his hands up early in the encounter, the parties disagree as to whether Mr. Gilbert was in a fighting stance or exhibiting signs of aggression. (*See* Doc. 78 ¶ 51.) Defendants point to the testimony of Officer Stuckey, who testified Mr. Gilbert raised his fists and assumed a fighting stance, which led Officer Stuckey to believe Mr. Gilbert was going to start hitting him. (*Id.*; Doc. 67-8 at 34:19–35:9, 36:10–21) Defendants also point to the testimony of Officer DeGregorio, who initially entered the cell with Officer Stuckey. (Doc. 78 ¶ 51.) Officer DeGregorio testified that Mr. Gilbert raised a fist toward Officer Stuckey, which led Officer Stuckey to try and handcuff Mr. Gilbert. (Doc. 67-43 at 59:13–60:8.) Plaintiffs point to the deposition testimony of Officer King (Doc. 78 ¶ 51), who testified Mr. Gilbert "just had his hands up" (Doc. 78-2 at 16:24–17:19). Officer King was in the booking area, not the cell, at this time, and he testified that he was not watching when the Officers first approached Mr. Gilbert, so he did not witness the encounter. (Doc. 67-4 at 9:10–22, 16:10–22.) The Court finds this immaterial for the same reasons stated in the previous footnote and for additional reasons discussed *infra*.

wrist.  Sergeant Bergmann attempted to control Mr. Gilbert by grabbing his right arm, which Mr. Gilbert was flailing and concealing underneath him in an attempt to avoid being handcuffed. While Mr. Gilbert was kneeled over the bench, Sergeant Bergmann and Officer Stuckey were able to get his right wrist cuffed.  (Doc. 78 ¶¶ 49, 52, 53–57; Doc. 86 ¶ 8.)

The Officers eventually cuffed both of Mr. Gilbert's hands.  After he was handcuffed, Mr. Gilbert tried to stand up, kicked the officers, and reared backwards off of the bench.  Mr. Gilbert also thrashed his head about on the concrete bench and suffered a gash on his forehead, which started to bleed.  After he was handcuffed, Mr. Gilbert kicked Officer Stuckey, who had been standing over him to cuff him, in his groin area, causing Officer Stuckey to stumble backward.  After Officer Stuckey was kicked, Sergeant Bergmann called for help and for someone to bring leg shackles.  (Doc. 78 ¶¶ 58–61.)[8]  Officer Stuckey then left and went back to the counter by the clerk's station and could not see Mr. Gilbert.  (Doc. 67-8 at 41:15–18, 42:21–43:17.)

In response to Sergeant Bergmann's request for leg shackles, Officer Wactor retrieved shackles from the central patrol desk and brought them to Mr. Gilbert's cell, where Mr. Gilbert continued to struggle over the bench with multiple officers.  Officer King responded to Sergeant Bergmann's request for help, and, after grabbing Mr. Gilbert's ankles to keep him from kicking, assisted Officer Wactor in shackling Mr. Gilbert's legs.  (Doc. 78 ¶¶ 62–63.)

---

[8]  In their Responses to Defendants' Statement of Uncontroverted Material Facts, Plaintiffs assert a general "deny" response to the paragraphs setting forth these facts.  (*See* Doc. 78 ¶¶ 58-61.)  In their blanket denial, Plaintiffs argue that Mr. Gilbert was not ignoring commands or being violent, but that, instead, he was trying to open up his lungs to breathe, an act known as "air hunger," citing as one source to an expert report from Dr. Francisco Diaz, one of their experts. Importantly, however, Plaintiffs do not deny the factual predicate.  The Court, therefore, finds that the facts, themselves, are undisputed.  Moreover, the Court excluded Dr. Diaz's testimony regarding "air hunger" to the extent he opined that Mr. Gilbert's struggles reflected such air hunger.  The Court further discusses analyzes these facts and Dr. Diaz's report *infra*.

After Mr. Gilbert's legs were shackled, Sergeant Bergmann requested that someone call EMS. Sergeant Bergmann's intention in requesting EMS was to get Mr. Gilbert to a hospital to determine if he was fit for confinement or, alternatively, to be admitted to the hospital for his suicide attempt. Upon hearing Sergeant Bergmann's request, Officer King, who, having assisted in shackling Mr. Gilbert's legs was leaving the cell to return to his regular duties, radioed the dispatcher to request EMS in connection with Mr. Gilbert's "possible psychotic issues." EMS was first called at 6:15 p.m. (Doc. 78 ¶¶ 64–66; Doc. 86 ¶ 19.)

In further response to Sergeant Bergmann's request for help, Officer Stuckey yelled at the clerk, Ms. Wilburn, to sound the holdover alarm, but when Ms. Wilburn appeared unable to locate the alarm, Officer Stuckey left the holdover and yelled into the hallway for help with a combative subject. The alarm was also activated, which broadcasted a looped message stating that an officer was in need of assistance in the holdover. After Officer Stuckey yelled for help, he stayed outside the holdover for some time to compose himself, and he did not return to Mr. Gilbert's cell. (Doc. 78 ¶¶ 67–69.)

A number of officers responded to the alarm and to Officer Stuckey's calls for help. Officer Mack responded to the holdover from the report writing room at central patrol. When he got to the holdover, Officer Mack observed officers struggling to control Mr. Gilbert, who was handcuffed and shackled, and crouched over the bench in his cell. Officer Mack relieved Officer DeGregorio. Upon being relieved by Officer Mack, Officer DeGregorio, feeling exhausted, left the cell and went outside to catch his breath. Officer Mack relieved Officer DeGregorio's position holding Mr. Gilbert down after Officer DeGregorio became exhausted. Officer Mack took control of Mr. Gilbert's upper left arm and attempted to prevent Mr. Gilbert from thrashing about and hitting his head against the concrete. (Doc. 78 ¶¶ 70–74; Doc. 86 ¶ 42.)

After he relieved Officer DeGregorio, Officer Mack assisted in moving Mr. Gilbert from the bench to a prone position on the floor, which was more secure and which presented less of a tripping hazard. After Mr. Gilbert was moved to the floor, Officer Opel, who had responded to the holdover from the report writing room, relieved Sergeant Bergmann, who told Opel to control Mr. Gilbert's right side so Mr. Gilbert would not bang his head on the concrete. After he was relieved by Officer Opel, Sergeant Bergmann, feeling winded from an intense struggle, stepped out of the cell and off to the side. (Doc. 78 ¶¶ 75–77.)

In addition to Officers Mack and Opel, Officers Cognasso, Lemons, and vonNida also responded to Mr. Gilbert's cell and assisted in bringing him under control. (Doc. 78 ¶¶ 78.) Officer Cognasso, who had responded from the rear desk in central patrol when he heard Officer Stuckey's plea for help, responded to find Mr. Gilbert thrashing his shackled legs back and forth, kicking the officers, and moving his body around. (Doc. 78 ¶ 79.)[9] Officer Cognasso put his knees on the back of Mr. Gilbert's calves to prevent him from striking anyone. Officer Lemons, who had responded from the report writing room to find Mr. Gilbert struggling and kicking, assisted by placing his knee on Mr. Gilbert's leg to prevent him from kicking. Officer vonNida, who had responded from outside the holdover, assisted by holding Gilbert's arm or leg, and securing him so he could not thrash about. (Doc. 78 ¶¶ 80–82.)

While Mr. Gilbert struggled against the officers on the floor, the Officers controlled Mr. Gilbert's limbs at his shoulders, biceps, and legs and did not place their body weight on him in a manner that would compress his neck.[10] Mr. Gilbert was trying to raise his chest up during the

[9] *See supra* n.8. Again, Plaintiffs issue a general denial of this paragraph based on "air hunger" but do not deny the facts or testimony.

[10] *See supra* n.8. Plaintiffs issue a general denial of this paragraph based on "air hunger" and further generally contend in their response to this paragraph that the Officers held Mr. Gilbert down by placing pressure on his back and torso, citing to deposition testimony from Officer

altercation. (Doc. 86 ¶ 26.) After struggling with officers on the ground for several minutes, Mr. Gilbert calmed down to the point where he was no longer kicking, flailing, and actively fighting against his restraints, and the Officers rolled him from his stomach onto his side. (Doc. 78 ¶¶ 84.)[11]

Officer Cognasso stood up, and Sergeant Bergmann used his radio to check if EMS was en route and to ask the dispatcher to have EMS "step it up" so they could "get this guy [Gilbert] out of here." A nearly contemporaneous audio recording of the police dispatcher relaying Sergeant Bergmann's request to EMS shows that Bergmann's call was made at 6:26 p.m. Officer Cognasso, who heard Sergeant Bergmann's call for EMS, left the holdover to wait outside for EMS to respond. (Doc. 78 ¶¶ 86, 87.)

At some point, Mr. Gilbert's breathing appeared abnormal to the officers. After Mr. Gilbert was rolled onto his side, Officer Mack then rolled Mr. Gilbert on his back, checked for a pulse, and was able to find a pulse in Mr. Gilbert's neck. (Doc. 78 ¶ 93; Ex. E at 22:1-16.)

At some point, Mr. Gilbert stopped breathing. Officer Mack requested someone retrieve the AED. Officers vonNida and Opel went to retrieve the AED. Officer Mack also updated Sergeant Bergmann regarding Mr. Gilbert's condition, and Sergeant Bergmann radioed dispatch to upgrade the pending request for EMS to "urgent" on the grounds that Mr. Gilbert "may not be breathing." A nearly contemporaneous audio recording of the police dispatcher relaying Sergeant Bergmann's request to EMS shows that Bergmann's call was made at 6:27 p.m. Officer Mack checked Mr. Gilbert's pulse again and was unable to find a pulse. After Officer

---

Michael Cognasso, which the Court addresses *infra*. Plaintiffs do not dispute, however, the stated facts relating to the shoulders, biceps, legs, or neck.

[11] *See supra* n.8. Again, Plaintiffs issue a general denial of this paragraph based on "air hunger" but do not deny the facts or testimony. Therefore, the factual predicate, including that the Officers moved Mr. Gilbert to his side once he stopped struggling, is undisputed.

Mack was unable to find a pulse, Officers Mack and Wactor began performing chest compressions on Mr. Gilbert as he lay on his back. Officers Mack and Wactor also performed rescue breathing on Mr. Gilbert. When Officers vonNida and Opel returned with the AED, Officers vonNida and Wactor attempted to use the machine to shock Gilbert's heart, but the AED machine never signaled that Mr. Gilbert had a shockable heart rhythm. At 6:33 p.m., Sergeant Bergmann again radioed dispatch to check on the status of EMS, advised that EMS needed to "step it up," and was told by the dispatcher that EMS would be arriving "any minute." Officers Mack and Wactor performed CPR until the fire department showed up and the fire department medics relieved the officers. Eventually, an ambulance arrived and transported Mr. Gilbert to the hospital, where he was pronounced dead. (Doc. 78 ¶¶ 95–105.)

There were no video or audio recorders in the holdover area, so there is no video or audio of these events.

## B. The Autopsy & Investigation

After Mr. Gilbert's death, Dr. Jane Turner conducted an autopsy for the St. Louis City Medical Examiner. Post mortem testing performed during Dr. Turner's investigation showed that Mr. Gilbert had a large concentration of methamphetamine in his system and that he had significant heart disease. (Doc. 78 ¶¶ 106, 107, 109.) The parties do not dispute that Dr. Turner's report stated that the manner of death was accidental and that the cause of death was "Arteriosclerotic Heart Disease Exacerbated by Methamphetamine and Forcible Restraint." (Doc. 67-13 at 138.) In her pathological findings, Dr. Turner reported contusions and laceration of face, contusions and abrasions of upper and lower extremities, a small soft tissue contusion of the left shoulder area, and a fractured sternum. (Doc. 67-13 at 138, Doc. 67-32 at 34:18–24.) She did not find any petechial hemorrhages. (Doc. 67-32 at 34:18–24.)

The SLMPD also completed an investigation.  As part of this investigation, photographs were taken, showing blood on the scene.  Each of the Officers was interviewed, and their transcribed statements were included in a final police report.  Dr. Turner's autopsy report was provided to the police and was made part of the investigative report.  (Doc. 78 ¶¶ 112-114.)  The Officers were not disciplined.  (*See* 67-34.)

## C.    The City's Training and Policies

The City's Police Department is internationally accredited by the Commission on Accreditation for Law Enforcement Agencies, Inc., or "CALEA," an international police accreditation organization, and the SLMPD's policies cross-reference relevant CALEA standards.  The City's use of force policy is long and detailed, and provides, at its core, that "Officers will use the least amount of force reasonably necessary to accomplish their lawful objectives while safeguarding their own lives and the lives of others."  (Doc. 78 ¶¶ 115, 116.)

Although the parties disagree over whether the City provided training or had a policy on the use of force specifically governing Mr. Gilbert's situation, it is undisputed that all of the City's officers, including the Officer Defendants, have been trained on the use of force (also known as "defensive tactics") and receive monthly refresher tests on the use of force through the SLMPD's "PASS" system.  (Doc. 78 ¶ 117.)

The SLMPD's policy relating to operations in its holdovers provides, among other things, that prisoners who are under the influence of alcohol or drugs and who are violent to the point of being self-destructive should be continually observed and may be placed in restraints at a supervisor's discretion until such time as they are transported to an appropriate medical facility. The policy also provides that prisoners who attempt suicide or are potentially suicidal should be observed at all times and that officers may confine persons if it is reasonably believed they are

mentally ill or under the influence of drugs and pose an imminent likelihood of harm to themselves or others.  (Doc. 78 ¶¶ 118–20.)

The SLMPD does not have a specific, separate policy for restraining emotionally disturbed persons or persons with organic brain syndrome.  Rather, when such persons must be restrained, such restraints must comply with the SLMPD's general use of force policy.  In order to avoid the need for any individual officer to exert great force while restraining a combative subject, officers are taught to work as a team to control the subject's limbs.  (Doc. 78 ¶¶ 115–116, 118, 121, 130.)  Prone restraint is not prohibited by the SLMPD.  (Doc. 78 ¶ 26.)

## II. Analysis

The qualified immunity doctrine "shields government official from civil damage liability for discretionary action that 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017), *reh'g denied* (June 5, 2017), *cert. denied*, 138 S. Ct. 737 (2018) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is not available "if an official 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [individual], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury.'"  *Harlow*, 457 U.S. at 815 (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)).  "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotations omitted).

In determining whether an officer is entitled to qualified immunity, the Court employs a two-step analysis that asks: (1) whether the alleged facts, when viewed in the light most favorable to the plaintiff, demonstrate that the official's conduct violated a constitutional right;

and (2) whether the constitutional right being asserted is clearly established. *Wallingford v. Olson*, 592 F.3d 888, 892 (8th Cir. 2010) (cited cases omitted). The Court may address either question first. *Boude v. City of Raymore*, 855 F.3d 930, 933 (8th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "If either question is answered in the negative, the public official is entitled to qualified immunity." *Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007) (quoted case omitted). "To avoid pretrial dismissal, a plaintiff must present facts showing the violation of a constitutional right that was clearly established at the time of defendant's act." *De La Rosa*, 852 F.3d at 743.

Under the Fourth Amendment, the test for determining whether excessive force was used under the first prong of the analysis is whether "the amount of force used was objectively reasonable under the particular circumstances." *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009)). *See also Hicks v. Norwood*, 640 F.3d 839, 842 (8th Cir. 2011) ("It is settled in this circuit that the Fourth Amendment's 'objective reasonableness' standard for arrestees governs excessive-force claims arising during the booking process."). The Court determines "whether a use of force was reasonable by balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *McKenney v. Harrison*, 635 F.3d 354, 359 (8th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The "[r]easonableness of a seizure is determined by the totality of the circumstances and must be judged from the viewpoint of a reasonable officer on the scene." *McCoy v. City of Monticello*, 342 F.3d 842, 848 (8th Cir. 2003) (citing *Graham*, 490 U.S. at 396–97). Thus, the reasonableness of force depends on the circumstances confronting the officers, including factors

such as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Shannon v. Koehler*, 616 F.3d 855, 862 (8th Cir. 2010) (citing *Graham*, 490 U.S. at 396). This inquiry is objective, questioning "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397; *see also McCoy*, 342 F.3d at 848 (reasonableness "must be judged from the viewpoint of a reasonable officer on the scene, irrespective of the officer's underlying intent or motivation.") The Court "must assess the actions of each officer 'from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.'" *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017) (quoting *Graham*, 490 U.S. at 396). "This calculus allows for the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Brown*, 574 F.3d at 496 (quoting *Graham*, 490 U.S. at 396). "Once the predicate facts are established, the reasonableness of the official's conduct under the circumstances is a question of law." *McKenney v. Harrison*, 635 F.3d 354, 359 (8th Cir. 2011) (quoting *Mann v. Yarnell,* 497 F.3d 822, 825 (8th Cir. 2007)) (internal quotation omitted).

The Court elects to address the "clearly established" qualified-immunity prong first, because it is dispositive of the case. *See*, *e.g.*, *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014); *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 (8th Cir. 2014) (even assuming without deciding that force used was excessive in violation of Fourth Amendment rights, such rights were not clearly established at the time of the incident, thus entitling officers to summary judgment).

**A.  The Defendant Officers' conduct did not violate a clearly established right.**

While "the defendant bears the burden of proof for this affirmative defense [of qualified immunity], the plaintiff must demonstrate that the law was clearly established."  *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014) (citations and internal quotations omitted).  The law must be clearly established at the time the incident in question took place.  *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  To determine whether a right is clearly established for qualified immunity purposes "we ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008) (quoted case and internal quotations marks omitted).  In other words, the "'contours of the clearly established right must be sufficiently clear'" such that "'every reasonable official would have understood that what he is doing violates that right.'"  *De La Rosa v. White*, 852 F.3d 740, 745 (quoting  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) and *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "'Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* (quoting *Mullenix*, 136 S. Ct. at 308).

"Whether the constitutional right at issue was 'clearly established' is a question of law for the court to decide."  *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013) (citation omitted).  While a case directly on point is not required, "'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *De La Rosa*, 852 F.3d at 745 (quoting *Mullenix*, 136 S. Ct. at 308); *see also Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.") (quotation omitted).  In fact, the Supreme Court recently reiterated that "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at

issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 136 S. Ct. at 309).

Where there is "no controlling Eighth Circuit authority placing the question beyond debate," qualified immunity applies unless there is a "'robust consensus of cases of persuasive authority'" demonstrating whether the particular conduct, under similar circumstances, violated clearly established law. *De La Rosa*, 852 F.3d at 745–46 (quoting *al-Kidd*, 563 U.S. at 742). Moreover, when there is no controlling Eighth Circuit authority and other circuits are split on the issue, the law is not clearly established. *See*, *e.g.*, *Burton v. Richmond*, 370 F.3d 723, 730 (8th Cir. 2004).

In this case, Plaintiffs cannot defeat the Officers' defense of qualified immunity unless Plaintiffs are able to show that a reasonable officer would have been on notice as of December 8, 2015, that the Officers' conduct violated a clearly established right. *See De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 (8th Cir. 2014). Even assuming the Defendant Officers did not use objectively reasonable force under the first prong of the qualified immunity analysis and after a careful review of the record, the Court finds that the Officer Defendants are entitled to summary judgment because they did not violate a clearly established right. For the reasons discussed below, the Court finds controlling Eighth Circuit law does not place the question beyond debate and there is not a robust consensus of persuasive authority, as the circuits are split over the outcome in cases with similar facts. As such, the Defendant Officers are entitled to qualified immunity.

1. **Preliminary Matters**

Plaintiffs argue broadly that the "right to be free from asphyxiating, prone restraint was clearly established." (Doc. 79 at 8.) The Court finds that this framing of the issue for the clearly established analysis is too broad. As the Eighth Circuit recently reiterated, "we cannot 'define

clearly established law at a high level of generality.'" *Ehlers v. City of Rapid City*, 846 F.3d

1002, 1012 (8th Cir. 2017) (quoting *Mullenix*, 136 S. Ct. at 308); *see also White v. Pauly*, 137 S.

Ct. 548, 552 (2017) (finding it again necessary to reiterate to lower courts "the longstanding

principle that 'clearly established law' should not be defined 'at a high level of generality'")

(citations omitted). Instead, "'[t]he dispositive question is whether the violative nature of

*particular* conduct is clearly established.'" *Ehlers*, 846 F.3d at 1012 (quoting *Mullenix*, 136 S.

Ct. at 308) (emphasis in original). The Supreme Court recognized that "'[s]uch specificity is

especially important in the Fourth Amendment context, where . . . [i]t is sometimes difficult for

an officer to determine how the relevant legal doctrine, here excessive force, will apply to the

factual situation the officer confronts.'" *Id.* (quoting *Mullenix*, 136 S. Ct. at 308). Plaintiffs

seem to take the position that prone restraint is never acceptable under any circumstances,

regardless of the level of force that is used or other circumstances facing the officers, once a

suspect is handcuffed. (*See*, *e.g.*, Doc. 78 ¶ 126; Doc. 79 at 12; Doc. 86 ¶ 102, 104.) However,

that position, as will be discussed below, does not square with the pre-existing law.

Since "the clearly established law must be 'particularized' to the facts of the case," *White*,

137 S. Ct. at 552, in order to properly frame the issue for this Court's consideration and as a

preliminary matter, the Court finds it necessary and helpful to first address some of Plaintiffs'

arguments regarding the facts in this case.

### a. Mr. Gilbert's Actions of Resistance

Plaintiffs argue that Mr. Gilbert posed no threat to anyone and claim an ill motive to the

initially responding Defendant Officers' actions. *See McCoy v. City of Monticello*, 342 F.3d 842,

848 (8th Cir. 2003) (officers' underlying intent or motivation irrelevant). However, it is

undisputed that the Officers were responding to Mr. Gilbert's apparent attempt to hang himself

by tying an article of clothing around his cell bars and putting it around his neck. (Doc. 78 at ¶¶ 33-47.) And it is undisputed that Mr. Gilbert attempted to evade the officers when they arrived at his cell. (*Id.* at ¶¶ 52–53.) Under these circumstances, it was not unreasonable for the Officers to restrain Mr. Gilbert. Police officers are authorized to detain persons who may pose a danger to themselves. *See Lacy v. City of Bolivar*, 416 F.3d 723, 727 (8th Cir. 2005) (discussing standard under Mo. Rev. Stat. § 632.305 authorizing detention). Moreover, given Mr. Gilbert's apparent suicide attempt, the Officers had authority to restrain him. *See Winters v. Adams*, 254 F.3d 758, 763-64 (8th Cir. 2001) (police are authorized to stop and detain persons who appear dangerous to themselves or others as part of their "community caretaking" function). Additionally, even accepting Plaintiffs' argument that Mr. Gilbert was having a mental health crisis and posed no threat (Doc. 79 at 6–7), the Officers would still be entitled to qualified immunity. *See*, *e.g.*, *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1292 (11th Cir. 2009) (affirming district court's grant of summary judgment in section 1983 case where emotionally disturbed and agitated detainee, who was hog tied in prone position and died of asphyxia, was not a danger to officers or forcefully attacking them, but was deemed by court to be a safety risk merely because of his refusal to comply with officers' simple instructions, his inability to remain calm, and his continued struggling); *Giannetti v. Stillwater*, 216 Fed. App'x 758–59 (10th Cir. 2007) (finding officers' deadly force upon prone jailed detainee reasonable when detainee simply refused to put on jumpsuit).

It also is undisputed that, throughout the encounter, Mr. Gilbert thrashed, fought, kicked, and otherwise struggled with the Officers. Each and every one of the Officers, as noted above, witnessed and reacted to these acts. For example, during the initial struggle with Officer Stuckey, Officer DeGregorio, and Sergeant Bergmann, and even after Mr. Gilbert was

handcuffed, he tried to stand up from a kneeling position, kicked the officers, and reared back off of the bench. While on the bench, Mr. Gilbert thrashed his head on the concrete bench with such force that he suffered a gash on his forehead. While the Officers were retrieving leg shackles, Mr. Gilbert continued to struggle over the bench with multiple Officers, including kicking. Indeed, Plaintiffs do not dispute that Officer King, who had recently arrived on the scene, had to hold Mr. Gilbert's ankles to keep him from kicking as leg shackles were being applied and that Officer Wactor also witnessed Mr. Gilbert struggling with multiple officers as he then helped apply the leg shackles.

It is undisputed that Officer Stuckey yelled for additional help from other officers to assist with a combative subject. When those Officers arrived, it is undisputed that Officer Mack observed officers struggling to control Mr. Gilbert even though he was already handcuffed and shackled and that Officer Mack took control of Mr. Gilbert's arm to prevent him from thrashing about and hitting his head. It is undisputed that, at this point, Mr. Gilbert was moved to a prone position on the floor, which was more secure, and that Officer Opel secured Mr. Gilbert's right side to ensure he would not bang his head on the concrete. It also is undisputed that the Officers who later helped also witnessed a struggle. For instance, when Officer Cognasso arrived on the scene, he witnessed Mr. Gilbert kicking his legs back and forth, kicking the officers, and moving his body around. Officer Lemons similarly witnessed Mr. Gilbert struggling and kicking, and Officer VonNida secured Mr. Gilbert so he could not thrash about.

Defendants argue these facts demonstrate Mr. Gilbert was resistant, combative, and non-compliant. Plaintiffs either wholly admit these facts or at times argue—without disputing the facts themselves—that some of these actions were not evidence of resistance or combativeness,

but of "air hunger" or a struggle to breathe while being restrained.[12]  Plaintiffs point, in part, to the fact that Mr. Gilbert raised his chest up during the altercation.

The Court will take as true Plaintiffs' versions of events and assume that Mr. Gilbert's actions were innocent, that he was not ignoring commands or being violent, and that his actions were based on "air hunger."  Even so assuming, however, the Court finds that it was not established as a matter of law that the Officers should have interpreted Mr. Gilbert's actions of kicking, thrashing, and otherwise fighting as "air hunger" instead of resistance.  Instead, as will be discussed more below, courts in this and other circuits routinely interpret such actions as objectively reasonable evidence of resistance.  *See*, *e.g.*, *Boude v. City of Raymore*, 855 F.3d 930, 933–34 (8th Cir. 2017) (qualified immunity does not depend on whether the individual's actions were "*in fact*" innocent but, rather, "the key" is whether the officers reacted reasonably to the circumstances as they appeared to the officers) (emphasis in original); *Ehlers*, 846 F.3d at 1011 (8th Cir. 2017) (rejecting nonviolent misdemeanor arrestee's argument that he was not resisting "because he at least appeared to be resisting"); *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012) (when detainee "characterize[d] his struggles [of neither remaining still nor stopping moving while being handcuffed] merely as an effort to breathe," finding "even if [his] motive was innocent, the [officers] reasonably could have interpreted [his] actions as resistance and responded with an amount of force that was reasonable to effect the arrest"); *see also Abbott v.*

---

[12]  *See supra* n.8.  Plaintiffs point to non-judicial sources in support of their air hunger argument. Plaintiffs also rely heavily on the opinion of their retained experts, Dr. Diaz, in supporting their "air hunger" arguments. (*See* Doc. 86 ¶ 27.)  Dr. Diaz is a board-certified forensic pathologist who has focused his career on, among other things, performing post-mortem examinations and reviewing deaths in custody.  In his expert report, Dr. Diaz concluded that Mr. Gilbert's struggle was a direct reflection of his "air hunger," ultimately leading to asphyxiation.  (Doc. 74-6.) Defendants sought to exclude Dr. Diaz's testimony.  The Court, under separate order, excluded his testimony in part, including to the extent he opined that Mr. Gilbert's struggles reflected such air hunger.  Even if, however, the Court were to consider all of these sources, the Court would still find the Defendant entitled to qualified immunity based on the case law.

*Sangamon Cnty.*, 705 F.3d 706, 712 (7th Cir. 2013) (arrestee is not subdued if he "continue[s] to resist" or "fail[s] to submit to the officer's authority"); *Bornstad v. Honey Brook Twp.*, 211 F. App'x 118, 120 (3d Cir. 2007) (in case involving prone resistance, finding the officers' deadly force reasonable even when there was evidence that the detainee stated he was "having trouble breathing"); *Giannetti v. Stillwater*, 216 Fed. App'x 756, 760, 764 (10th Cir. 2007) (finding officers' force reasonable even though the restrained detainee indicated she could not breathe and screamed that her lungs were collapsing, rejecting the plaintiff's argument that her physical struggle and kicking resulted from panic when faced with hampered breathing and possible suffocation).

Plaintiffs also point to the testimony from two inmates who were in the holdover area at the time of this incident. One inmate testified, "I didn't hear him say help, but it was like – basically like fighting." (Doc. 77-3 at 13:9–14:18.) In his initial witness statement, though, the inmate did not indicate Mr. Gilbert said this. (Doc. 67-13 at 104.) Another inmate, who Defendants assert was high on marijuana at the time, testified as follows when asked if he heard what Mr. Gilbert testified: "'It hurt.' I heard, 'It hurts. Stop.' I heard – say 'Ah.' 'Stop.' 'It hurt.' 'Oh, if – I was hurting.' I think it could have been the officer saying 'Stop resisting' or 'Stop.' I don't know." (Doc. 77-7, 20:9-21:18).[13] Plaintiffs argue that this testimony demonstrates Mr. Gilbert was "yelling pleas for help" and pleading "It hurts. Stop." (Doc. 86 ¶¶

---

[13] Plaintiffs also point to the testimony of one of the inmates who stated in his deposition, but not in his initial witness statement, that the Officers beat Mr. Gilbert up. This, however, was based on pure speculation and assumption, as he could not actually see the events in Mr. Gilbert's cell. (Doc. 77-3 at 34:25–35:18; Doc. 86-1 at 32:24–33:4.) Plaintiffs point to no testimony to corroborate this unsupported testimony. Moreover, the cited cases support the conclusion that even if an individual is in distress, summary judgment is not precluded. *See*, *e.g.*, *Wagner v. Bay City*, 227 F.3d 316, 321 (5th Cir. 2000) (officers entitled to qualified immunity in case involving deadly, prone restraint even when evidence suggested detainee was treated roughly).

11, 13.)  Even assuming Mr. Gilbert made such statements, this does not preclude summary

judgment.  *See*, *e.g.*, *Bornstad*, 211 F. App'x at 120 (officers' deadly force reasonable even when

there was evidence that the prone individual was "yelling out for help"); *Giannetti*, 216 Fed.

App'x at 760 (force reasonable even when prone detainee "moaned that 'we're killing her, that

we're hurting her' . . . said 'stop, you're hurting me' . . . and pleaded 'please stop, oh, God,

please.'").

> b.  <u>The Defendant Officers' Restraint & Cause of Death</u>

The parties also present different theories regarding the level of force used by the

Defendant Officers on various parts of Mr. Gilbert's body.  Defendants argue that the Officers

used the level of force necessary to restrain Mr. Gilbert as he was continually resisting and did

not use asphyxiating pressure on his body.  Plaintiffs argue that the Officers "held down" Mr.

Gilbert using asphyxiating pressure, including on his back.

It is undisputed that the Defendant Officers applied force to varying parts of Mr. Gilbert's

body.  For example, Officer Stuckey grabbed Mr. Gilbert's left wrist while attempting to

handcuff him.  Once Mr. Gilbert was handcuffed, Officer DeGregorio grabbed Mr. Gilbert's left

bicep and left wrist while Sergeant Bergmann grabbed his right arm.  After being kicked in the

groin by Mr. Gilbert, Officer Stuckey left and returned to doing paperwork.  Once Officer King

arrived, he grabbed Mr. Gilbert's ankles.  It was at this point that Mr. Gilbert's legs were

shackled.  Officer King then left.  When Officer Mack arrived to relieve Officer DeGregorio,

Officer Mack took control of Mr. Gilbert's upper left arm.

It is undisputed that it was only after this point that Mr. Gilbert was moved to a prone

position.  (Doc. 78 ¶ 75.)  After Mr. Gilbert was prone, Officer Opel controlled Mr. Gilbert's

right side to protect his head from banging on the concrete, Officer Cognasso put his knees on

the back of Mr. Gilbert's calves, Officer Lemons placed his knee on Mr. Gilbert's leg, and Officer vonNida held Mr. Gilbert's arm or leg so he would not thrash about. They continued to control him at his shoulders, biceps, and legs, and Plaintiffs have proffered no evidence that the Officers compressed Mr. Gilbert's neck.

Plaintiffs argue, by pointing to testimony of some of the Officers, that all of the Officers were "holding down" Mr. Gilbert with their "weight" and that at least some of the force was directed at Mr. Gilbert's back. (*See*, *e.g.*, Doc. 86 ¶¶ 14-15, 16, 33-34, 37-55.) For example, Plaintiffs point to testimony that Officer Opal "took control of the subject on the right side," that Officer vonNida "kind of held [Mr. Gilbert's] side in place," and that Officer Cognasso said that, though he could not identify which Officers, there were Officers at his upper right side and possibly a lower or middle part of his torso. (Doc. 77-2 at 137, 167; Doc. 77-11 at 20:12–19.)[14]

Plaintiffs also rely on the expert report of Dr. Diaz in support of their argument, who opined that the restraint included "the weight of the individuals being on him" while Mr. Gilbert was prone and then stated a general proposition that when "weight of the restrainers is applied to the back, a cascade of events occur the most important of which is a mechanical impairment of breathing that leads to asphyxia." Both parties do agree that forcible restraint was one cause of death. They differ, however, in assertions as to the main cause of death. In his expert report, Dr. Diaz concluded that the main cause of death should have been forcible restraint inducing asphyxia with arteriosclerotic cardiovascular disease and amphetamine as the underlying factors. (Doc. 74-6.) He opined that pulmonary edema exhibited in the autopsy findings (fluid on the lungs) resulted from asphyxiation. In his deposition, he noted that the autopsy report showed

---

[14]  A review of various depositions reveals that Plaintiffs characterize the Defendant Officers' testimony of their actions under the broad-brush term "holding down," without regard to the specific facts/testimony of the officers' actions. Even assuming Plaintiffs' version of the testimony, the Defendant Officers are still entitled to summary judgment.

injuries, including "to the lower extremities and up to the buttocks, and he had injuries that manifested as bleeding into the left scapular area. That's the left shoulder area." (Doc. 67-33 at 69:16–25.) However, when asked whether he could tell where Officers exerted pressure on Mr. Gilbert, Dr. Diaz testified that he could not tell. (*Id*. at 67-33 at 68:22–24.)

This stands in contrast to the expert opinion of Dr. Jane Turner, the forensic pathologist and medical examiner who performed Mr. Gilbert's autopsy. Dr. Turner concluded that the manner of death was accidental, further concluding that the cause of death was arteriosclerotic cardiovascular disease, exacerbated by methamphetamine and forcible restraint. Dr. Turner disagreed with Dr. Diaz by ruling out asphyxiation in her autopsy report, as she saw no evidence of asphyxiation, such as petechial hemorrhages. (Doc. 67-32 at 29:18–30:3.) Citing to literature, she concluded the large amount of amphetamine along with the forcible restraint caused Mr. Gilbert's already significantly diseased heart to go into arrhythmia, which explained the pulmonary edema. (Id. 33:13–24, 50:10–53:17.)

The Court will assume Plaintiffs' version of facts as true that at least some Officers used force at Mr. Gilbert's "sides" or torso or back or other parts of his body, and even further that the cause of death was asphyxiation. Still, the Court finds that summary judgment is not precluded and that the Officers are entitled to qualified immunity. As is discussed more below, multiple courts have found similar force used to be objectively reasonable even when applied upon various parts of the body, including the back, while the detainee is restrained in a prone position. And courts have ruled in favor of officers even when the evidence suggested death by asphyxiation. *See, e.g., Pratt v. Harris Cnty.*, 822 F.3d 174, 178–79 (5th Cir. 2016) (affirming summary judgment when force was used upon back of prone, handcuffed individual whose legs were restrained despite disagreement between experts over cause of death); *Hill v. Carroll Cnty.*,

587 F.3d 230, 232–37 (5th Cir. 2009) (restraining a resistant individual in a hog-tie for thirty minutes was not unconstitutionally excessive even when the plaintiff's medical expert testified specifically that the individual died from asphyxia, which conflicted with the main cause of death noted in the autopsy); *Bornstad*, 211 Fed. App'x at 121 (force used upon resistant individual who was prone in handcuffs and with feet bound did not violate the individual's right to be free from the use of excessive force even when expert concluded main cause of death was compressional asphyxia); *Dyer v. Blankenship*, No. 4:07-CV-02105-AGF, 2011 WL 1226941, at *8, 15 (E.D. Mo. Mar. 30, 2011) (force objectively reasonable despite conflicting expert testimony regarding whether asphyxia was a cause of death resulting from individual in handcuffs and shackles being restrained in the prone position by officers' body weight).

### c. *The Restraint in Relation to Mr. Gilbert's Breathing*

Plaintiffs also argue in their responses to Defendants' statement of material facts that the Officers "did not stop pushing Mr. Gilbert down until after he stopped breathing." Defendants, on the other hand, argue the testimony shows that Mr. Gilbert did not stop breathing until he was re-positioned on his side, after he calmed down and stopped resisting.

Sergeant Bergmann and Officers Cognasso, Lemons, Mack, Opel, vonNida, and Wactor all assert that while Mr. Gilbert was struggling against the officers on the floor, his breathing did not appear abnormal. (*See* Doc. 78 ¶ 88.) For example, Officer VonNida testified that once Mr. Gilbert stopped actively thrashing and the Officers turned him onto his side, it appeared to him that Mr. Gilbert was holding his breath. After Mr. Gilbert was turned onto his side, Officer vonNida observed Mr. Gilbert taking a deep breath and then holding it in then exhaling after receiving a sternum rub. (Doc. 67-9 at 16:9–17:13, 21:16–22:10.) Officer Opel also testified that after Mr. Gilbert was turned on his side, he seemed to be holding his breath and his

breathing became shallow (Doc. 67-7 at 21:16–22:21.)  Moreover, Officer Wactor testified that

Mr. Gilbert's breathing was irregular once he was on his side.  (Doc. 67-10 at 24:2–10.)   Officer

Mack similarly testified that after rolling Mr. Gilbert onto his side, he was calm, but his

breathing was growing increasingly erratic.  (Doc. 67-6 at 20:22–21:5.)  After monitoring his

breathing, Officer Mack testified that Mr. Gilbert was no longer a threat, so he removed his

handcuffs and rolled him onto his back.  (Doc. 67-6 at 21:2–10.)  Though Mr. Gilbert's breathing

was increasingly erratic, Officer Mack checked for a pulse and was able to find one.  (*Id.* at

22:10-12.)  At some point, someone rolled Mr. Gilbert onto his back.  Shortly after Officer Mack

was able to find a pulse, Mr. Gilbert stopped breathing, causing Officer Mack to request the

AED.  (*Id.* at 22:11–16.) (*See also* Doc. 78 ¶¶ 85, 88–92, 94.)

Plaintiffs admit that Officer Mack was able to find a pulse as he so testified.  (Doc. 78 ¶

93.)  They, however, assert that the Officers "held Mr. Gilbert down and did not get off of him"

until after Mr. Gilbert stopped breathing.  (Doc. 86 ¶ 35.)  In support of their argument, Plaintiffs

point to the testimony of one officer, Officer Lemons, who testified, "When the resisting

stopped, we stood up.  I noticed that he wasn't breathing" and "I can't say what officers were

doing.  All I know is when he stopped breathing, we got up . . . [a]nd there was an officer

beginning doing CPR."  (Doc. 67-5, 15:9–16:18.)  Saying the Officers "got up" is not the same

as saying they "held Mr. Gilbert down and did not get off of him" until he stopped breathing.

Regardless, even accepting as true that Mr. Gilbert remained restrained and in a prone

position until he stopped breathing, and as will be further discussed below, the Officers would

still be entitled to qualified immunity for it was not clearly established that this violated a

constitutional right.  *See*, *e.g.*, *Gunter v. Twp. of Lumberton*, 535 F. App'x 144, 146, 148 (3d Cir.

2013) (force was objectively reasonable even when individual, who was restrained in handcuffs

attached to leg restraints, was left by officers in prone position until he stopped breathing); *Giannetti*, 216 Fed. App'x at 760 (force was objectively reasonable even though officers used restrained detainee in handcuffed, prone position until to the point where she was unresponsive); *Abbey v. City of Reno*, No. 3:13-CV-0347-LRH-VPC, 2015 WL 13547828, at *3 (D. Nev. Mar. 30, 2015), *aff'd*, 690 Fed. App'x 538, at*3 (9th Cir. 2017) (officers' use of force against resisting individual, who was having a mental crisis, reasonable even though individual stopped breathing soon after multiple officers released their hold on individual while he was still in prone position with feet restrained and tied to the handcuffs); *Dyer*, 2011 WL 1226941, at *6-7 (officers' use of asphyxiating force reasonable when individual did not appear to be breathing while prone in handcuffs and leg shackles and still being physically restrained with weight of officer on his back); *Williams v. Chambers*, No. 4:07-CV-01409-ERW, 2010 WL 481299, at *8 (E.D. Mo. Feb. 5, 2010) (officers' use of deadly force objectively reasonable when individual became unresponsive and ashen while still being physically restrained in prone position by officers' body weight).

**2. The Pre-Existing Law:  The law did not clearly establish in December 2015 that the use of prone restraint in this context constituted excessive force.**

With this factual predicate in mind, the question before the Court, then, is whether the Defendant Officers violated clearly established law in using force on different parts of Mr. Gilbert's body in the manner in which they did while Mr. Gilbert was apparently resisting and bound and shackled in a prone position, resulting in asphyxiation.  The Court finds that excessive force cases involving the use of prone restraint did not provide the Defendant Officers with fair and clear warning that positioning and restraining Mr. Gilbert in the prone position as he continually resisted was unconstitutionally excessive as of December 2015.  Therefore, the Officers are entitled to qualified immunity.

### a. Pre-Prone Restraint

The Court will first address the Officers who used force on Mr. Gilbert while he was kneeling across the concrete bench inside the cell. Plaintiffs argue broadly in their Memorandum in Opposition to this Motion that the "right to be free from asphyxiating, prone restraint was clearly established." (Doc. 79 at 8.) They continue to focus on the positioning of Mr. Gilbert, further arguing, by pointing to case law, that "holding down a handcuffed, prone subject is dangerous and unreasonable," "putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force," and "putting pressure on a handcuffed individual in the prone position amounts to excessive force." (Doc. 79, 9-10.) As set forth above, it is undisputed that some of the Officers only used the allegedly excessive force <u>before</u> Mr. Gilbert was in the prone position, namely Officers Stuckey, DeGregorio, King, and Sergeant Bergmann.[15] Plaintiffs do not dispute that Mr. Gilbert was moved to a prone position on the ground after some of the Officers had stopped using restraint and left. (Doc. 78 ¶ 75.) Officer Stuckey left the cell after being kicked in his groin area, which was after Mr. Gilbert was handcuffed but before his legs were shackled. Officer DeGregorio was relieved by Officer Mack before Mr. Gilbert was moved

---

[15] Plaintiffs broadly suggest that all of the Officers, including those Officers only present toward the beginning, were "holding down" Mr. Gilbert's back. Plaintiffs point specifically to the testimony of Officer DeGregorio, who testified he "kept [his] right hand on [Mr. Gilbert's] back to remain control of him as he still continued to fight and wriggle." (Doc. 77-2 at 7.) They also point to the testimony of Officer King, who testified he saw Sergeant Bergmann "lean over the top of Nicholas Gilbert." (Doc. 77-2 at 120.) Considering Mr. Gilbert's erratic behavior, initial struggle, and continued resistance, this application of pressure was reasonable under the circumstances. *Williams*, 2010 WL 481299, at *13 (rejecting the plaintiff's suggestion that the officers were laying or otherwise on top of him and instead finding officers' use of hands to hold down subject was reasonable given arrestee's "erratic behavior" and continued resistance); *Dyer*, 2011 WL 1226941, at *15 (straddling arrestee's back was reasonable considering arrestee's initial struggle and continued resistance). The law was not clearly established that this violated a constitutional right.

into a prone position, and Officer King left to return to his regular duties right after Mr. Gilbert's legs were shackled.[16] Importantly, all of these actions occurred while Mr. Gilbert was <u>not</u> in the prone position. Instead it is undisputed that, at this time, he was kneeling over a bench.

To be prone means lying flat or lying face downwards on one's belly. Oxford English Dictionary Online, http://www.oed.com/view/Entry/152519, https://en.oxforddictionaries.com/definition/prone (last visited November 12, 2018). One of Plaintiffs' own exhibits includes drawings of detained individuals in the prone position as lying completely flat. (Doc. 78-11, at 3, 5.) Mr. Gilbert was not lying flat while kneeling over the bench.

Plaintiffs have not pointed the Court to cases that support an argument that it violates an individual's clearly established right when such force (even assuming some force was upon the back) is applied to a non-prone, kneeling detainee. Rather, the law allows officers to hold down a resistant subject, even using their body weight, in order to gain control. *See*, *e.g.*, *Ryan v. Armstrong*, 850 F.3d 419, 427–28 (affirming summary judgment when multiple officers restrained prone, resisting detainee in jail cell using body weight, including weight on the detainee's back); *see also Risdal v. Nixon*, 589 Fed. App'x 801, 803 (8th Cir. 2014) (concluding the force used to handcuff and restrain inmate was objectively reasonable, in light of his aggressive behavior, when individual was brought "under control by taking him to the ground, and during the struggle, [he] struck his head on a chair"). In fact, the Eighth Circuit has upheld the use of arguably severe force when officers are attempting to restrain a resisting subject. *See*,

---

[16] Although the timing is not exact, the undisputed facts demonstrate Sergeant Bergmann, who was relieved by Officer Opel after Mr. Gilbert was moved into a prone position, soon thereafter stepped out of the cell and off to the side. (Doc. 67-2 at 44:14–45:25.) Regardless, it is undisputed that when Officer King testified he saw Sergeant Bergmann "lean over" Mr. Gilbert—to the extent there was even any contact made—Mr. Gilbert was kneeling over the bench, not in the prone position.

*e.g.*, *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 897–98 (8th Cir. 2014) ("emotionally disturbed" individual's right to be free from multiple, ultimately deadly, tasings when he assumed a fighting stance as officers approached him and continued to resist arrest not clearly established); *Winters v. Adams*, 254 F.3d 758, 761, 763–65 (8th Cir. 2001) (rejecting argument that officers should have just "walk[ed] away" from individual who was "acting strangely," agitated, under the influence of methamphetamine, and otherwise "erratically behaving" in light of "community caretaking functions of police officers," and instead holding that district court erred in finding excessive force when officer punched individual in the eye who continued to resist); *Mann v. Yarnell*, 497 F.3d 822, 824, 826 (8th Cir. 2007) (when arrestee refused police orders to lie flat on his stomach, twisted, and otherwise continued to resist, finding it was reasonable to apply force against arrestee's neck, use hold maneuver on legs, and use a canine to bite arrestee to bring non-compliant arrestee under control).  These Officers, therefore, are entitled to qualified immunity.[17]

       *b.  Prone restraint.*

       Moreover, for the reasons discussed below, the result does not change for the remaining Officers, Wactor, Mack, Opel, Cognasso, Lemons, and VonNida.  For example, Plaintiffs point to testimony indicating that Officers Wactor, Lemons, and Cognasso restrained Mr. Gilbert's legs.  (Doc. 86 ¶¶ 45, 51, 55.)  However, Plaintiffs do not point to any law demonstrating that the mere act of shackling an individual's legs while in the prone position violates a clearly established right.  Moreover, even if the testimony that some Officers were restraining Mr. Gilbert's sides, biceps or shoulders, or were at his torso area indicate that some Officers applied

---

[17]   Even considering these Officers' actions in combination with the other Officers' actions, *Ryan*, 850 F.3d at 428, the Court still finds the Officers are entitled to qualified immunity based on the additional case law discussed *infra*.  Moreover, even assuming that Mr. Gilbert was "prone" while kneeling over the bench, the Court would still find that those Officers are entitled to summary judgment, as it was not clearly established as of December 2015 that their actions violated a constitutional right based on the case law discussed below.

force to Mr. Gilbert's back while in the prone position, there is no robust consensus of persuasive authority that the use of force under the circumstances of this case violated a clearly established right. Courts have found that it is reasonable to hold down various parts of an individual's body, including the back and torso areas, even when the individual is prone. *See*, *e.g.*, *Williams*, 2010 WL 481299, at *13 (lying on torso of handcuffed, prone individual "does not make the force unreasonable, considering the initial struggle and [the individual's] continued resistance"); *Dyer*, 2011 WL 1226941, at *15 (straddling back of restrained, prone individual "does not make the force unreasonable considering [the officers' initial struggle [with the individual]" and the individual's continued active resistance); *Pratt*, 822 F.3d at 178–79 (5th Cir. 2016) (affirming summary judgment when force was used upon back of prone, handcuffed individual whose legs were restrained); *Bussey-Morice v. Kennedy*, 657 Fed. App'x 909, 911 (11th Cir. 2016) (officers entitled to qualified immunity when they pinned, held down, or used pressure-point techniques on various parts individual's body, including the upper torso); *Giannetti*, 216 Fed. App'x at 760 (force used against prone, handcuffed, and resisting misdemeanor detainee was reasonable when several officers "held her legs, arms, head, and back down" put hands on her shoulder blades, restrained her legs in a figure-four restraint, placed a knee toward her middle back, placed a calf across her head, and placed a knee on her shoulder); *Wagner v. Bay City*, 227 F.3d 316, 319 (5th Cir. 2000) (force used was reasonable even when there was testimony that an officer put his shin across a handcuffed and prone individual's back and that another officer observed two other officers "on top of" the restrained individual).

The Court will now turn to a more detailed discussion of the cases relied upon by the parties.

c. *The Eighth Circuit has found the use of prone restraint to control a non-compliant, resistant subject to be reasonable.*

The Eighth Circuit recently held—in a case with factual similarities to this case and relied upon by Defendants—that the simultaneous placing of body weight by multiple officers on a restrained, prone individual inside of a small jail cell which results in death does not amount to excessive force. *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017). In that case, the Eighth Circuit specifically ruled on whether "the placing of body weight on [the detainee] while he was on the ground in a prone position" was excessive. *Id*. at 427. The detainee in that case was in jail on a minor offense, outstanding traffic warrants, and appeared to be under the influence of drugs. *Id*. at 423. He "exhibited strange behavior" and "was behaving oddly," including making odd "lunging" and "animal-like" movements inside of the cell and banging on his cell. *Id*. Concerned about this erratic behavior, and after medical staff determined he needed to be removed from his cell to be assessed, a team of officers went to his cell to remove him. *Id*. Six officers, in total, were in his cell trying to restrain the detainee. *Ryan v. Armstrong*, 154 F. Supp. 3d 798, 804–05 (D. Minn. 2016). When directed to comply, the detainee initially resisted and continued actively resisting. *Ryan*, 850 F.3d at 424. Several officers went into the cell, held the detainee down while attempting to place his wrists and ankles in restraints, and used a taser. *Id.* While their weight was still on the detainee's back, the officers succeeded in handcuffing him and shackled his ankles with his legs crossed and bent at the back of the knees. *Id*. at 424, 429. Approximately five minutes after the officers entered the cell, the detainee was no longer responsive. *Id*. at 424.

On these facts, the Eighth Circuit found the district court did not err in granting qualified immunity to the multiple officers on the excessive force claim. *Id*. at 428. Among the facts "most important" to the Eighth Circuit's conclusion was that the detainee actively resisted at the

beginning of the encounter and continued to actively resist the officers' efforts to subdue him. *Id.* The court also pointed to the fact that the encounter lasted no more than five minutes, with body weight being used for three minutes, and the autopsy did not show any significant injury or trauma, although the autopsy did note that the death occurred during restraint. *Id.*

The Defendant Officers in this case similarly encountered an erratically behaving, persistently resistant detainee and attempted to and ultimately did restrain him inside of the confines of a jail cell by restraining various parts of his body. Four Officers initially attempted to restrain Mr. Gilbert before he was put prone on the ground, and, after being relieved at various points in time, six Officers used force to restrain Mr. Gilbert. *Ryan* suggests, therefore, that the Officers' conduct did not violate Mr. Gilbert's Fourth Amendment rights, even if some force was used upon Mr. Gilbert's back.

The parties dispute how long Mr. Gilbert was in prone position after he was handcuffed and leg shackled. (Doc. 86 ¶¶ 31.) While it is not possible to determine from the record exactly how long Mr. Gilbert was prone, Defendants assert the total amount of time was less than ten minutes, while Plaintiffs assert it was up to fifteen minutes.[18] (*Id.*) Since the *Ryan* court did discuss the length of prone force as one part of its analysis, the Court, out of an abundance of caution, will review persuasive case law.

Since the Court finds there is no controlling Eighth Circuit authority placing the question beyond debate, the Court must look to whether Plaintiffs can show there is a robust consensus of such persuasive authority. *De La Rosa*, 852 F.3d at 745–46. The Court finds that a review of persuasive case law cited by both parties demonstrates a lack of consensus.

---

[18] Defendants' timeline of events is supported by the undisputed timing of the calls to EMS and other undisputed facts. Regardless, the Court accepts Plaintiffs' argument that Mr. Gilbert was restrained prone for fifteen minutes for purposes of ruling on this Motion.

### d. _Multiple courts within this circuit have found that an officer's restraint of a handcuffed or shackled individual in the prone position is reasonable under facts similar to this case._

Two cases decided in this district are constructive.  In _Williams v. Chambers_, cited by Defendants in its briefing on the clearly established argument, the court granted summary judgment in the defendant officers' favor when deadly prone force was used.  _Williams v. Chambers_, No. 4:07-CV-01409-ERW, 2010 WL 481299, at *16 (E.D. Mo. Feb. 5, 2010).  In that case, the officers encountered an individual along a highway who was under the influence of cocaine and exhibiting agitated, erratic behavior.  _Id._ at *2–3, 9.  The officers attempted to restrain the individual by handcuffing him, but the individual repeatedly resisted and failed to comply, moving uncontrollably and flailing around, prompting the officers to use pepper spray. _Id_. at *4–5.  Once the subject was prone on the pavement, the officers used their body weight to restrain his feet, lower extremities and upper body, "holding him down with their hands," rendering the officers "exhausted."  _Id._ at *5–6.  Once the officers succeeded in handcuffing him, the officers restrained the individual in a variety of ways while he was lying prone, including using their body weight to hold down his feet, knees, and upper body and "chest area of his back."  _Id._ at *6.  The individual ceased struggling and stopped resisting at one point, but he resumed resisting, prompting the officers to continue to restrain his upper body area, legs, and ankles.  _Id._ at *6–8.  The officers kept him the individual in handcuffs even after he subsequently stopped moving while he was lying prone.  _Id._ at *8.  While the exact timeline is not clear, dispatch calls suggest he was in the prone position for approximately just under fifteen minutes. _See id._ at *5, 8.  After turning him over, the officers noticed the subject was non-responsive and having trouble breathing.  _Id._  The individual ultimately passed away soon after these events.  _Id._ at *9.  Even though there was evidence, conflicting at times, that force was applied directly to the

individual's back, the court nonetheless held that "this evidence does not make the force used unreasonable, considering the struggle and continued resistance." *Id.* at \*13. Citing to cases from other circuits involving prone restraint and asphyxia where those courts found the force used to be reasonable, the court held that, under these circumstances, the force used was objectively reasonable. *Id.* at \*14.[19]

In *Dyer v. Blankenship*, another court in this district similarly granted summary judgment in the defendant officers' favor when deadly prone force was used. *Dyer v. Blankenship*, No. 4:07-CV-02105-AGF, 2011 WL 1226941, at \*1 (E.D. Mo. Mar. 30, 2011). In attempting to take a resisting individual into custody, the officers placed him in a prone position while he was first handcuffed and then also leg shackled. *Id.* at \*4–5. The court noted there was conflicting testimony regarding whether one officer was lying over the detainee's back while handcuffed, and the court also noted there was conflicting testimony whether the detainee ceased struggling once the leg shackles were applied. *Id*. at \*5, 6. It was undisputed that, at one point, an officer did place his knee in the small of the detainee's back after he was handcuffed and shackled. *Id.* at \*6. After the suspect was calm, the officers stood up but noticed the detainee, who was still prone in handcuffs and leg shackles, did not look well. *Id*. at \*7. By the time the officers turned him over, he did not appear to be breathing and had only a weak pulse. *Id*. at \*8. The autopsy listed the cause of death as an accident due to excited delirium associated with cocaine and methamphetamine. *Id*. at \*8. Plaintiff, however, disputed the results, as the medical examiner also reported "petechial hemorrhages of the lungs," which Plaintiffs alleged was a sign of asphyxia. *Id*. In so opposing summary judgment by challenging the cause of death, Plaintiffs relied on their expert's conclusion. No. 4:07-CV-02105-AGF (E.D. Mo. Oct. 11, 2011), ECF

---

[19] Some of the cases relied on by the *Williams* court are the same cases relied on by Defendants.

No. 142.[20]  Despite the expert opinion and autopsy evidence suggesting asphyxia was the cause of death, the court found the force was objectively reasonable, considering in part that the detainee continually resisted.  *Dyer*, 2011 WL 1226941, at *15.  Even though the detainee stopped struggling while handcuffed and shackled in the prone position, the court found this evidence did not make the force unreasonable, considering the short amount of time between when the detainee stopped struggling and when he thereafter stopped breathing.  *Id.*

*Williams* and *Dyer* demonstrate that the Defendant Officers in this case did not violate clearly established law by using force on Mr. Gilbert in the prone position.  Likewise, here, the Officers encountered an erratically behaving individual with drugs in his system who had apparently attempted suicide, and each of the Officers was met with resistance while attempting to restrain him.  Like in those cases, the Officers applied force to various parts of the body of an individual who was in handcuffs and leg shackles or both.  As in those cases, the Defendant Officers' use of force was reasonable given Mr. Gilbert's struggle and continued resistance both before and after he was on the ground in the prone position.  *See also Mayard v. Hopwood*, 105 F.3d 1226, 1227–28 (8th Cir. 1997) (placing prone detainee, who was kicking and otherwise struggling with officers, in hobble restraint was objectively reasonable "particularly . . . in light of [the detainee's] resistance").

Moreover, even assuming that Officers Wactor, Mack, Opel, Cognasso, Lemons, and vonNida did not stop using force until after they realized Mr. Gilbert had stopped breathing, the Officers' testimony demonstrates that any time period between when Mr. Gilbert stopped

---

[20] The defendants moved to exclude that testimony, arguing the expert's opinions were unsupported by scientific study, speculative, and inadmissible.  No. 4:07-CV-02105-AGF (E.D. Mo. July 12, 2010), ECF No. 105.  The court summarily denied that motion, and, thus, considered that opinion while ruling on the motion for summary judgment.  No. 4:07-CV-02105-AGF (E.D. Mo. Aug. 27, 2010), ECF No. 131.

struggling and thereafter stopped breathing was short.  (*See*, *e.g.*, Doc. 67-7 at 21:16–23:1; Doc. 67-9 at 18:3–12, 23:11–17.)  Plaintiffs put forth no evidence to controvert that timeline.  *See Mann v. Yarnell*, 497 F.3d 822, 827 (8th Cir. 2007) (when non-movants rely on "[m]ere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, . . . [they cannot] withstand a motion for summary judgment.") (internal citations and quotations omitted).  In this context, "[e]vidence that [an individual with handcuffs and leg shackles in the prone position] stopped struggling, therefore, does not make the force unreasonable considering the short amount of time between when [the individual] stopped struggling and when he thereafter stopped breathing."  *Dyer*, 2011 WL 1226941, at *15.

> e. *Other Circuit Courts of Appeal have similarly found the use of asphyxiating prone restraint to control a resistant, non-compliant subject to be reasonable, even when force is applied to various parts of the body, including the back.*

In addition to in-circuit case law, case law from other circuits, cited by Defendants in their clearly established argument, supports the conclusion that the Officer Defendants did not violate clearly established law.

— The Tenth Circuit held that applying force upon the legs, arms, hands, and back of a handcuffed, misdemeanor detainee while in the prone position for nearly twenty minutes, resulting in death, was not unreasonable.  *Giannetti v. Stillwater*, 216 Fed. App'x 756, 758, 759 n.3, 760 (10th Cir. 2007).  The mentally ill detainee was in jail and being booked for a minor offense, when she refused to put on a jumpsuit as requested.  *Id.* at 758–59.  Due to her continued resistance, the officers handcuffed her and put her facedown in the prone position to try and remove her pantyhose before putting on the jumpsuit.  *Id.* at 759–60.  "During the nearly twenty minutes [the detainee] lay prone," multiple officers struggled inside a haz-mat room to put on her jumpsuit.  *Id.*  "During the majority of that time," the detainee struggled with the

officers by kicking and otherwise moving her body around. *Id.* And during this time, the officers "held her legs, arms, head, and back down in an effort to keep her from moving," put hands on her shoulder blades, restrained her legs in a figure-four restraint, placed a knee toward her middle back, placed a calf across her head, and placed a knee on her right shoulder. *Id.* at 760. Two officers testified she expressed "at least twice during the struggle that she was having difficulty breathing by 'scream[ing] that her 'lungs were collapsing' and at least once indicated that 'she couldn't breathe.'" *Id.* (alterations in original) Two officers also testified that she "moaned that 'we're killing her, that we're hurting her' . . . said 'stop, you're hurting me' . . . and pleaded 'please stop, oh, God, please.'" *Id.* After the officers were partially successful in putting on the jumpsuit, they asked the detainee to sit up, but she did not respond. *Id.* She remained handcuffed and partially on her stomach. *Id.* After a short amount of time, she did not appear to be breathing and her lips were "bluish," and she was turned on her back. *Id.* At that point, the officers began CPR and called for an ambulance. *Id.* The medical examiner's autopsy listed asphyxia as one cause of death. *Id.* at 761.

On these facts, the court found the officers' use of force to be reasonable, despite the plaintiff's arguments that her struggling and kicking resulting from her fear of suffocation and that the officers should have taken her mental illness and aberrant behavior into account. *Id.* at 764. The court reasoned that the detainee continued to struggle and kick, concluding "that the officer's continued use of force, although perhaps not the least intrusive choice they could have made, was not unreasonable in response to her escalating opposition." *Id.* at 765–66.

— The Third Circuit upheld the use of asphyxiating prone restraint involving a resistant, non-compliant arrestee. *Bornstad v. Honeybrook Twp.*, 211 Fed. App'x 118 (3d Cir. 2007). In attempting to subdue the arrestee, an officer pressed a knee into his chest. *Id.* at 120. At one

point, a witness heard the arrestee yell out "for help" and state he was "having trouble breathing." *Id*. When backup officers arrived, the several officers turned the arrestee over onto his stomach to eventually handcuff him behind his back and tie his feet together. *Id.* at 121. When they attempted to move him to the police vehicle, the officers noticed he was not breathing. *Id*. The officers' efforts to revive the individual were unsuccessful, and the individual was pronounced dead at the hospital. *Id*. The total length of the encounter was "substantial," lasting for over two hours. *Id.* at 123. The autopsy reports and death certificate listed asphyxia as the cause of death.[21] *Id.* at 121. Despite the fact that there were discrepancies between the officers' accounts and the medical experts' testimony and findings, the district court found that, even assuming the officers' actions caused asphyxia, the officers acted reasonably. *Id.* at 122. The Third Circuit affirmed summary judgment, pointing to the "resistance that [the individual] mounted throughout" the encounter, and distinguishing cases where the plaintiffs became compliant after they had been handcuffed and shackled. *Id.* at 123–25.

— The Third Circuit also upheld prone resistance in another case, finding that attaching a resistant suspect's leg restraints to his handcuffs was reasonable because the suspect "repeatedly kicked the officers after his hands were [handcuffed]" and then "continued to kick at the officers even after his legs were tied together." *Gunter v. Twp. of Lumberton*, 535 F. App'x 144, 146, 148 (3d Cir. 2013). After being restrained, the individual was "placed face down on the ground" and remained prone until "officers observed that [he] was not breathing." *Id.* at 146. In finding the officers' actions objectively reasonable, despite the fact that the parties disputed whether he

---

[21] In *Bornstad*, the district court refused to exclude testimony from the plaintiff's forensic expert that the proper cause of death was asphyxia. *Bornstad v. Honey Brook Twp.*, No. C.A.03-CV-3822, 2005 WL 2212359, at *10–11 (E.D. Pa. Sept. 9, 2005). The district court nonetheless found the officers' use of force was objectively reasonable, *id.* at *13-19, and the appellate court affirmed.

was restrained in the prone position for 10 to 15 minutes or less,[22] the court focused on the fact that the individual "repeatedly kicked" and otherwise resisted even after his hands and legs were restrained. *Id.* at 148.

— The Fifth Circuit Court of Appeals affirmed summary judgment when multiple officers placed a sporadically resisting and handcuffed arrestee in the prone position, restrained his legs, placed a knee on his back to maintain compliance, and used a hobble restraint (handcuffs that attach to an arrestee's ankles) to "hog tie" him,[23] resulting in his death. *Pratt v. Harris Cnty.*, 822 F.3d 174, 178–79 (5th Cir. 2016). The individual was placed under arrest after the officers witnessed him erratically behaving after a minor single-vehicle traffic accident. *Id.* at 178. The officers initially had to use force and multiple tasings to try and gain control of the individual, who was kicking and otherwise resisting at times after being handcuffed but before he was in the prone position. *Id.* Once he was in the prone position, with his hands cuffed and legs restrained by the force of the officers, force was applied to his back. *Id.* While still in the prone position, the officers were able to place a hobble restraint on his legs, and he stopped resisting. *Id.* at 78–89. After the individual stopped resisting, the officers then "hog tied" him by connecting his handcuffs to the hobble restraint. *Id.* at 179. Even though he had ceased resisting, he was maintained in the hog tie in the prone position until EMS arrived, at which point he did not have a pulse, ceased breathing, and ultimately passed away. *Id.* Plaintiff's and

---

[22]   Plaintiffs argued that officers restrained the suspect in the prone position with his cuffed hands attached to his leg restraints for 10 to 15 minutes. Brief for Appellant, *Gunter v. Twp. of Lumberton*, 2011 WL 9820200, at *11 (3rd Cir. 2011) (No. 12-3146). The district court found the encounter "rendered the officers physically exhausted." *Gunter v. Twp. of Lumberton*, No. CIV. 07-4839 NLH/KMW, 2012 WL 2522883, at *8 (D.N.J. June 29, 2012).

[23]   "Hog-tying" is a controversial restraint and is considered to be more extreme than just placing someone in handcuffs and shackling their legs. *See*, *e.g.*, *Cruz v. City of Laramie,* 239 F.3d 1183, 1188–89 (10th Cir. 2001) (collecting cases describing evidence of the danger of the hog-tie restraint).

defendants' experts disagreed as to the cause of death, with plaintiff's expert citing to injuries noted in the autopsy report and concluding the death was multifactorial. *Id*. On these facts, the court found the district court did not err in granting qualified immunity, reasoning the force was not excessive because the individual resisted, the officers were unaware specifically that he was under the influence of a substance, and he was restrained for a brief period.[24] *Id*. at 184.

— That was not the first time the Fifth Circuit upheld the use of ultimately deadly force upon a restrained, prone individual. In *Wagner v. Bay City*, the court held that the officers' actions were objectively reasonable even though arrestee, who had resisted arrest, stopped breathing and died after officers sprayed him with pepper spray, placed him face down on pavement to handcuff him, placed a shin across his back to hold him down, were positioned "on top of him," and placed him on his stomach in patrol car to transport him to jail even after he had stopped struggling. 227 F.3d 316, 318–19 (5th Cir. 2000). The court acknowledged that there were "inconsistenc[ies] in the sequence of events," "some question as to how long the defendants held [the individual] on the ground," "how roughly they treated him," and whether the individual was "struggling" before they handcuffed him in the prone position. *Id*. at 321. Nevertheless, the court reversed the district court's denial of summary judgment based on qualified immunity, declining to second-guess the officers' split-second decisions and finding the officers' actions reasonable in the context of the situation that the detainee created. *See id*. at 321, 324.

— The Eleventh Circuit also found ultimately deadly force did not violate a clearly established right when multiple officers used their body weight to subdue a prone and ultimately handcuffed individual who was having a mental crisis and resisting. In that case, officers were

---

[24] The appellate court does not note the length of time, but the entire encounter appears to have lasted for about ten minutes. *See Pratt v. Harris Cnty.*, No. CV-H-12-1770, 2015 WL 224945, at *1–3 (S.D. Tex. Jan. 15, 2015).

called to a hospital to assist in subduing a man who was suffering from a mental health crisis. *Bussey-Morice v. Gomez*, 587 Fed. App'x 621, 622 (11th Cir. 2014) (*Bussey-Morice I*). When four officers initially arrived on the scene, the individual assumed what the officers interpreted as a threatening stance and refused to comply with their orders. *See id.* at 623. After multiple tasings were unsuccessful and a fifth officer arrived on the scene, the officers went "hands on," restraining his legs and attempting to "pin [him] down" as he fought and struggled against the officers. *Id.* at 623–24. After a prolonged struggle, six officers were able to get him handcuffed. *Id.* at 624. Once handcuffed and in the prone position, the individual continued to struggle against multiple officers by kicking and preventing them from gaining control over his body. *Bussey-Morice v. Kennedy*, 657 Fed. App'x 909, 911 (11th Cir. 2016) (*Bussey-Morice II*). While in the prone position and handcuffed, another officer "joined the other officers," grabbed the individual's feet, "mov[ed] up [the individual's] body in order to gain control of his upper torso," used a knee to hold his head, used additional pressure-point techniques to gain compliance, and placed a pillowcase over his head. *See id.* The officers then placed him on a gurney in a four-point restraint, and it was later discovered that he was not breathing. *Bussey-Morice I*, 587 Fed. App'x at 625. Because the officer's actions were "measured as to the degree of resistance," the court could not "find, that as a matter of obvious clarity," the officer violated the individual's Fourth Amendment rights; thus, the officer's conduct did not violate a clearly established right and were entitled to qualified immunity. *Bussey-Morice II*, 657 Fed. App'x at 914–15; *Bussey-Morice I*, 587 Fed. App'x at 629 (officers entitled to summary judgment for tasing).

The Court finds that Mr. Gilbert's case has many similarities to the cited cases. Like in these cases, the Defendant Officers were met with a resisting subject and each Officer used force, as described previously, on different parts of Mr. Gilbert's body after he was in handcuffs

and leg shackles in the prone position. Even assuming that Mr. Gilbert was having a mental health crisis, that he was in the prone position for fifteen minutes, that Officers used force upon his back at times in addition to his extremities, that Mr. Gilbert did not stop breathing until they "got up," and that he died from asphyxiation, in finding the force used reasonable under these types of circumstances, these cases establish that none of the Officers violated a clearly established right.

While all of these cases, combined, inform the Court's decision, the Court finds *Giannetti* to be particularly instructive, as it is strikingly similar to this case in many respects. Both cases involve prone restraint used against individuals exhibiting mental disturbances after being booked for a minor offense. In *Giannetti*, the officers were merely trying to get the jailed detainee to put on a jumpsuit; here it is undisputed that the Officers were responding to Mr. Gilbert's attempted suicide. In both cases, multiple officers were involved in restraining the detainees inside of a space within a secured facility. In both cases, the detainees were restrained in the prone position while handcuffed and their feet were restrained for a period lasting approximately the same time. In both cases, the detainees fought the restraint. And, accepting Plaintiffs' version of facts as true, in both cases multiple officers used force upon various parts of the jailed detainees' bodies including the back until the individual stopped resisting and breathing, ultimately dying from asphyxiation. Like in *Giannetti*, even accepting that the Defendant Officers' use of force was not the "least intrusive choice they could have made," the Officers did not violate a right that was clearly established. In other words, even construing the facts in the light most favorable to Plaintiffs, the Officers are entitled to qualified immunity.

   *f.* <u>*Plaintiffs' non-controlling case law involving asphyxiating, prone restraint*</u>
    <u>*demonstrates a lack of a robust consensus in the case law.*</u>

  Plaintiffs cite to no controlling case law in support of their arguments on the clearly

established prong.  They do not cite any case law establishing that use of force upon a non-

prone/kneeling individual violates a clearly established right.  Plaintiffs rely on several cases

where other Courts of Appeal have found the use of prone force to be unreasonable.  Plaintiffs

argue that given this case law, any reasonable officer should have known that the force was

unnecessary and extremely dangerous.  (Doc. 79 at 11.)[25]  Though those cases involve similar

facts, the Court finds that the facts of the cases are not sufficiently aligned and are, therefore,

distinguishable.  *See De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 897 (8th Cir. 2014) (holding the

law was not clearly established when illustrative cases are not sufficiently aligned).  Thus, these

cases do not "squarely govern" the specific facts at issue in this case.

   For example, Plaintiffs cite *Weigel v. Broad,* 544 F.3d 1143, 1147 (10th Cir. 2008).  In

addition to not being binding precedent on this Court, the Tenth Circuit case is also

distinguishable from the present case.  In *Weigel,* an opinion by a divided court, the officers

encountered an emotionally disturbed individual who resisted arrest.  *Id.* at 1148.  Once

---

[25]  In addition to the case law, Plaintiffs point to other non-decisional authority in their
arguments.  (*See, e.g.*, Doc. 79 at 11.)  Even assuming that courts in the Eighth Circuit would
entertain such authority in their analysis, the Court finds that such non-decisional sources would
not alter the outcome of this case.  As the Court discusses, the case law is split over whether the
type of force used in this case violated a clearly established right.  As such, the issue is not
beyond debate.  Moreover, while Plaintiffs cite to articles suggesting that prone restraint is
unacceptable, Defendants have, for example, proffered an article published in the Forensic
Research & Criminology International Journal entitled "A Prospective Analysis of the Outcomes
of Violent Prone Restraint Incidents in Policing."  (Doc. 86-5.)  In that article, the researchers
conclude that prone restraint is safe and the preferred position for combative individuals, that the
prone position does not necessarily create an adverse medical outcome, and that the likelihood of
any injury is correlated with the degree of resistance and behaviors of the subject.  (*See id.*)
Even if the Court were to take judicial notice of Plaintiffs' and Defendants' authority, this would
lend further support to the Court's conclusion that there is no robust consensus, as the non-
decisional authority is split, too.

handcuffed, the individual continued to struggle, so the officers "[laid] across the back of [the arrestee's] legs," applied pressure to his upper body, including his neck and shoulders, by using hands and knees, and an officer straddled the arrestee's upper thighs and buttocks and held his hands in place while a bystander tried to apply leg bindings. *Id*. Once the leg bindings were applied, officers remained positioned on the arrestee's upper torso and on top of his legs until the individual went into cardiac arrest and ultimately passed away. *Id*. at 1148–49. On these facts, the court found that the officers used an unreasonable amount of force and violated clearly established law. *Id*. at 1152–54. However, an officer admitted that the arrestee was "subdued" and "just quit struggling," but force was continued to be applied upon his body for several minutes. *Id.* at 1149, 1154. Thus, the court noted that the pressure was applied to the decedent "for a significant period after it was clear that the pressure was unnecessary to restrain him." *Id.* at 1152. In this case, the Court has not found that the Defendant Officers continued to apply pressure to Mr. Gilbert after it was no longer necessary as he was not subdued or and did not quit struggling; rather, the evidence of Mr. Gilbert's continued resistance suggests that it was indeed necessary. *See, e.g.*, *Williams*, 2010 WL 481299, at *14 (distinguishing *Weigel* on similar grounds).

Plaintiffs also cite *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893 (6th Cir. 2004), in support of their argument, in which the court found the officers' conduct was unreasonable and violated clearly established law after a jury verdict for plaintiff. However, in *Champion,* the officer conduct that the Sixth Circuit upheld was specifically the use of pepper spray after the arrestee was handcuffed, hobbled, and under control. *Id.* at 897–98. The arrestee was autistic, nonresponsive and unable to speak. *Id.* at 896. Seventeen minutes elapsed between the application of the hobble device on the arrestee and the arrival of EMS. *Id.* at 897. Eyewitness

testimony from five individuals indicated that during this time, the officers "were laying on him, like how wrestlers do in the ring" with "all their strength," "on top of him," "laying on top of him," had a "knee in the middle of his back," and continued to use pepper spray while the individual was prone and "subdued on the ground and had stopped resisting." *Id*. at 898. And during this time, the arrestee vomited multiple times. *Id.* Every eyewitness stated "they did not see [the arrestee] struggle during this time." *Id*. The court recognized that it is clearly established "that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position *after being subdued and/or incapacitated* constitutes excessive force." *Id.* at 903 (emphasis added). In this case, on the other hand, Mr. Gilbert was not subdued and had not ceased struggling. Instead, Mr. Gilbert continued to kick, thrash, and otherwise move after he was handcuffed, while Defendants were applying the leg shackles, and thereafter. *See*, *e.g.*, *Bornstad*, 211 Fed. App'x at 125 (distinguishing *Champion* because arrestee was resistant); *Dyer*, 2011 WL 1226941, at *16 (distinguishing *Champion* because individual continued to resist arrest).

Another case cited by Plaintiffs, *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), is similarly distinguishable. In that case, the officers encountered a mentally ill individual who they attempted to take into custody so he could be brought to a mental facility. *Id*. at 1053. While the arrestee was prone and handcuffed, an officer put his knee into the arrestee's back and placed the weight of his body on him. *Id*. at 1054. Another officer similarly placed the weight of his body on the arrestee, including placing a knee on his neck. *Id*. Two eyewitnesses verified that the arrestee repeatedly told the officers he could not breathe and that they were choking him and that the officers were laughing during the course of events. *Id.* at 1054–55. The arrestee was prone and handcuffed for twenty minutes. *Id.* at 1055. The court held that immunity was

not available because "kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law." *Id.* at 1062. In its analysis, the court noted that once on the ground, prone and handcuffed, [the arrestee] did not resist the arresting officers." *Id*. at 1059, 1061. Despite "offering no resistance," the court reasoned, the officers persisted despite his repeated cries for air and also stood around and laughed at him. *Id.* at 1062. Given Mr. Gilbert's continued resistance throughout the incident, this is unlike *Drummond*, where the plaintiff became compliant after being handcuffed and shackled. Here, for example, Mr. Gilbert continued to thrash his legs back and forth and otherwise move his body around even after he was handcuffed and his legs were shackled. As the Court discussed above, all of the Defendant Officers, including Wactor, Mack, Opel, Cognasso, Lemons, and VonNida, reasonably interpreted this as resistance as a matter of law. *See*, *e.g.*, *Abbey v. City of Reno*, 690 Fed. App'x 538, 539 (9th Cir. 2017) (finding *Drummond* distinguishable because the detainee offered no resistance after being handcuffed, but detainee in *Abbey* "actively assisted arrest before and during the altercation, including after being handcuffed"); *Bornstad*, 211 Fed. App'x at 125 (reasoning, "[g]iven the resistance that [the detainee] mounted throughout his arrest, it is impossible to compare, as the appellant wishes, the circumstances of his arrest with those in *Drummond* or *Champion,* in which the plaintiffs became compliant after they had been handcuffed and shackled. The officers were not required to treat the still-resisting [detainee] in the same manner as was required of the officers in either *Drummond* or *Champion.*"); *Giannetti*, 216 Fed. App'x at 766 (reasoning that "[u]nlike *Drummond*, where [the arrestee] no longer resisted after the officers placed him in a prone position, [the detainee in this case] actively resisted, kicked, and thrashed at the officers.").

The Court also finds *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990), distinguishable on its facts. In that case, ten officers simultaneously entered a jail cell and collectively used force against a misdemeanant detainee refused to surrender contraband or his personal effects. *See id.* at 401. The court found the force used to be excessive and malicious based on the following facts: the officers strategized before entering the cell; an officer put his arm around the detainee's neck; and officer nicknamed "Beef" due to his large size sat on the detainee's chest; once the detainee was suspect and prone, a tape recording demonstrated the detainee submitted to their actions, begged for help and screamed, and laid silent and motionless for several minutes before they exited the cell; and the officers left him in that position and motionless until the next morning, when he was discovered dead from asphyxia. *Id.* at 402. The force used in Mr. Gilbert's case is not comparable to this situation, as there was no evidence in *Simpson* that the detainee resisted once he was in handcuffs and leg shackles, and he laid silent and motionless for several minutes before being left overnight. *Compare Pratt*, 822 F.3d at 184, *and Wagner*, 227 F.3d at 324 (noting later-decided Fifth Circuit cases finding prone force reasonable).

Plaintiffs place a lot of emphasis on Mr. Gilbert being restrained in the prone position for fifteen minutes after being handcuffed and shackled, even citing to that in the first sentence of their brief in opposition to this Motion and repeatedly emphasizing it throughout their response. (*See* Doc. 79.) However, a review of the case law does not establish a bright-line rule regarding the length of time a resistant individual can be constitutionally maintained in a prone position, even when in handcuffs and leg shackles. *See*, *e.g.*, *Pratt*, 822 F.3d at 183 (citing *Hill v. Carroll Cnty.*, 587 F.3d 230, 232–37 (5th Cir. 2009) (restraining a resistant individual in a hog-tie for thirty minutes was not unconstitutionally excessive because the plaintiff could not establish that the "deputies had no objective basis not to use four-point restraints" in light of her resistance and

even though medical expert testified specifically that the individual died from asphyxia);

*Giannetti*, 216 Fed. App'x. at 759 n.3 (use of ultimately deadly force upon the legs, arms, hands, and back of a handcuffed misdemeanor detainee while in the prone position for nearly twenty minutes was reasonable).  Therefore, even accepting Plaintiffs' version of events by assuming Mr. Gilbert was restrained in a prone position for up to fifteen minutes, the Court still finds that the Defendant Officers' conduct did not violate a clearly established right for the reasons already discussed and the additional reasons discussed below.

Plaintiffs also assert that Defendants' argument fails because "Defendants fail to cite to a single case where force was found to be objectively reasonable when applied after an individual was restrained in the prone position in a secure facility."  (Doc. 79 at 13.)  The Court rejects the notion that Defendants must cite to a case with that level of specificity to have qualified immunity.  *See*, *e.g.*, *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (requiring this "particularized" showing "is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful") (internal citations omitted); *De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017) ("We do not require a case directly on point") (internal quotations and citations omitted).  Moreover, the burden is on Plaintiffs, not Defendants, to demonstrate the law was clearly established.  *See*, *e.g.*, *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014).  Regardless, in Defendants' reply, they did cite to a case where a court found the force objectively reasonable in such an instance— inside of a secure facility; with officers applying force upon the legs, arms, hands, and back of a handcuffed, misdemeanor detainee lying prone for even longer than in this case; and resulting in an unfortunate death.  *See*, *e.g.*, *Giannetti*, 216 Fed. App'x at 756, 758, 759 n.3, 760.

Moreover, even if there is an argument to be made that the cases cited by Plaintiffs are not fully distinguishable because they share some factual similarities to this case, the Court would still find the Defendant Officers are entitled to qualified immunity, as Mr. Gilbert's case also shares factual similarities with the cases cited by Defendants.  Plaintiffs argue:  "Everyone agrees the prone position is OK until the suspect is handcuffed.  It's what happens after the cuffs are applied that matters . . .  'As soon as the suspect is handcuffed, get him off his stomach.'" (Doc. 79 at 12.)  Yet the case law does not support that argument.  Instead, courts are not in agreement that a suspect must be moved out of the prone position as soon as he is handcuffed.

Considering there is no controlling authority in the Eighth Circuit and the circuits are split among and within themselves on cases with similar facts involving the use of force upon a prone individual, the Court finds there is no "robust consensus" such that "every reasonable officer would have understood that what he is doing violates that right" or such that the question is "beyond debate."  *See*, *e.g.*, *Wilson v. Layne*, 526 U.S. 603, 618 (1999) (recognizing federal circuit split and noting "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy" when finding law was not clearly established); *De La Rosa*, 852 F.3d at 740 (reiterating there must be a robust consensus); *Burton*, 370 F.3d at 730 (law not clearly established when no controlling Eighth Circuit authority and circuits are split); *Murphy v. Dowd*, 975 F.2d 435, 437 (8th Cir. 1992) (same).   Plaintiffs have not cited law clearly establishing a constitutional right to be free from the type of force used by Officers Stuckey, DeGregorio, King, and Sergeant Bergmann while Mr. Gilbert was in a kneeling position.  Moreover, there is no controlling or robust consensus of persuasive authority demonstrating the force used by Officers Wactor, Mack, Opel, Cognasso,

Lemons, and VonNida while Mr. Gilbert was in the prone position violated clearly established law.

While the law on the use of force in situations involving prone restrain may ultimately move more toward the direction Plaintiffs suggest, the law as of December 8, 2015, was not clearly established. *See*, *e.g.*, *De Boise*, 760 F.3d 892, 897 (finding law not clearly established when case law was "still developing"). Indeed, some of these cases relied upon by Defendants and factually similar to this case were decided after December 8, 2015, lending further support to the notion that the contours of prone restraint were not clearly established as of December 2015. The Court recognizes that another district court within the Eighth Circuit recently denied the officers' request for qualified immunity on summary judgment in a case where ultimately deadly force was used upon a restrained individual in the prone position. *Hanson for Layton v. Best*, No. CV 15-4578 (MJD/SER), 2017 WL 5891697, at *1 (D. Minn. Nov. 28, 2017), *appeal filed*, No. 17-3821 (8th Cir. Dec. 29 2017).[26] First, that case was decided after December 8, 2015, so for purposes of the clearly established analysis, it was not part of the "existing precedent" available at the time the Defendant Officers acted. *al-Kidd*, 563 U.S. at 741.[27] Moreover, the case is factually distinguishable, as officers restrained an arrestee who the court found was only sporadically resisting in the prone position with two sets of handcuffs and a hobble restraint around his ankles for approximately forty minutes. *Hanson*, 2017 WL 5891697 at *2, 6. In deciding *Hanson*, the Eighth Circuit might very well provide additional clarification beyond

---

[26] Oral arguments in that case were heard on November 14, 2018. Defendants have appealed the portion of the court's order denying them qualified immunity based on whether the law was clearly established law.

[27] The same is true for *Hopper v. Plummer*, 887 F.3d 744, 748-55 (6th Cir. 2018), another case relied upon by Plaintiffs that was decided after December 2015 (finding officers not entitled to qualified immunity when officers used their body weight to restrain an inmate, who had a seizure and was not resisting, in handcuffs in the prone position during a 22-minute encounter).

*Ryan* on the acceptable use of force upon a prone individual. However, taking into account the totality of the circumstances in Mr. Gilbert's case and the totality of the law as it existed in December 2015—and viewing the Defendant Officers' actions singularly and in combination—the Court finds that the officers are entitled to qualified immunity.

The Eighth Circuit has made it clear: "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (quotation omitted). *See also Bussey-Morice II*, 657 Fed. App'x at 913 ("[I]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.") (internal quotations and citations omitted). Here, there is no bright line.

The circumstances in this case were tense, uncertain, and rapidly evolving. While the ultimate injury here is fatal and unfortunate, the "'mere fact that an injury occurred while an individual was in police custody is not sufficient to avoid summary judgment.'" *Williams v. Chambers*, No. 4:07CV01409 ERW, 2010 WL 481299, at *14 (E.D. Mo. Feb. 5, 2010). Despite the result that night, qualified immunity insulates the Officers from liability for Mr. Gilbert's death.

Since Plaintiffs have failed to establish the conduct in this case, even when construed in the light most favorable to them and accepting their theory of events, violated clearly established standards, the Court need not reach the issue of whether the alleged facts demonstrate that the Defendant Officers' conduct was objectively reasonable, i.e., violated a constitutional right. *See*, *e.g.*, *Smith*, 754 F.3d at 546.

**B.  The City is entitled to summary judgment on Counts I through III.**

Plaintiffs argue they are entitled to relief under Counts I through III because the City's unconstitutional policies and procedures, as well as its deliberately indifferent training of its

officers, caused the violation of Mr. Gilbert's constitutional rights. Specifically, Plaintiffs argue that the City's policy for restraining citizens in holding cells is facially unconstitutional and caused the violation of Mr. Gilbert's rights and that the City's failure to train its officers or enact constitutional policies relating to restraining an individual in the prone position amounts to deliberate indifference to citizens' rights. (Doc. 79.)

A Fourth Amendment seizure requires an intentional act by an officer, and does not address "accidental effects of otherwise lawful government conduct." *Brower v. Cnty. of Inyo,* 489 U.S. 593, 596–97 (1989). This Circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim. *See, e.g., Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* failure to train municipal liability.") (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986)); *McCoy v. City of Monticello,* 411 F.3d 920, 922 (8th Cir. 2005) (concluding because district court properly granted officer summary judgment on excessive force claim, the City could not be liable in unconstitutional policy/custom theory or failure to train/supervise theory); *McVay v. Sisters of Mercy Health Sys.,* 399 F.3d 904, 909 (8th Cir. 2005) (stating "[s]ince we have found that [the officer's] actions were not unconstitutional, McVay cannot make a prima facie case against the City under section 1983"); *Turpin v. Cnty. of Rock,* 262 F.3d 779, 784 (8th Cir. 2001) (concluding because district court properly granted officers summary judgment on qualified immunity grounds, county likewise was entitled to summary judgment); *Veneklase v. City of Fargo,* 248 F.3d 738, 748 (8th Cir. 2001) (en banc) (declaring "where arresting police officers are absolved of liability to arrestees, the City ordinarily is not liable"); *Thomas v. Dickel,* 213 F.3d 1023, 1026 (8th Cir. 2000) (reasoning "[b]ecause we have found that the officers' stop

of the plaintiffs' car did not violate their fourth amendment [ ] rights, it follows that the plaintiffs' claim against the city (inadequate training and municipal custom) must likewise fail"); *Eagle v. Morgan,* 88 F.3d 620, 628 (8th Cir. 1996) (declaring decision that officers' conduct did not violate plaintiff's constitutional right to privacy disposed of related claims against the city); *Abbott v. City of Crocker,* 30 F.3d 994, 998 (8th Cir. 1994) (holding city cannot be found liable on either a failure-to-train theory or a municipal custom/policy theory unless a defendant police officer is found liable on an underlying substantive claim).

The Court held above that the Defendant Officers are entitled to qualified immunity in their individual capacity because there was no clearly established constitutional right. Therefore, the City cannot be held liable under § 1983 on either an unconstitutional policy or custom theory or on a failure to train theory.

### III. Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 63) is **GRANTED** and that all remaining counts are **DISMISSED, with prejudice**.

A separate judgment will accompany this Order.

Dated this 1st day of February, 2019.

       /s/ Noelle C. Collins
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE